STATE of Oklahoma, ex rel. Thomas
H. MAY, District Attorney of
Ottawa County, Oklahoma, Appellant,

v.

SENECA–CAYUGA TRIBE OF OKLA-
HOMA, James Allen, Chief and
Business Manager, Appellees.

STATE of Oklahoma, ex rel. Thomas
H. MAY, District Attorney of
Ottawa County, Oklahoma, Appellant,

v.

QUAPAW TRIBE OF OKLAHOMA, Wal-
ter King, Business Manager, and Sonny
Glass, Operations Manager, Appellees.

Nos. 60074, 60075.

Supreme Court of Oklahoma.

July 2, 1985.

As Corrected on Denial of
Rehearing Jan. 13, 1986.

Thomas H. May, Dist. Atty., Miami, for appellant.

Ben Loring, Hall, Loring & Smith, Miami, for appellee—Seneca-Cayuga Tribe.

John H. Charloe, Ethel C. Krepps, Tulsa, Nancy M. Tuthill, Albuquerque, for appellee—Quapaw Tribe.

J. Lawrence Blankenship, Duane N. Rasmussen, Oklahoma Tax Com'n., Oklahoma City, for amicus curiae.

OPALA, Justice.

Four issues are presented on appeal: (1) Are the lands on which the Seneca-Cayuga Tribe and the Quapaw Tribe conduct bingo games "Indian Country" as defined by 18 U.S.C. § 1151?[1] (2) If so, is the State's suit barred by the doctrine of tribal sovereign immunity? (3) If not barred by tribal immunity, will the provisions of PL 83–280[2] prevent an exercise of state jurisdiction because its assumption would constitute *per se* an infringement upon tribal self-government? and, if not, (4) How far may the State extend its regulation of bingo games conducted in "Indian Country"?

We hold that: (a) the lands in question are "Indian Country" as defined by 18 U.S.C. § 1151(c); (b) the State's injunction suit is not barred by tribal sovereign immunity since that doctrine has largely been displaced by the principles of federal preemption and infringement on tribal self-government; (c) PL 83–280 is not an absolute bar to state jurisdiction; and (d) whether the State may regulate the playing of bingo in Indian Country presents a mixed issue of law and fact which must be resolved after an evidentiary hearing in the trial court.

In separate actions the State of Oklahoma [State] sought to enjoin the Seneca-Cayuga Tribe and the Quapaw Tribe [hereinafter Quapaw, Seneca-Cayuga or Tribes] from conducting unlicensed bingo playing on certain lands held in trust by the United States government for the Tribes.[3] The

JON D. DOUTHITT, Judge.

In separate suits by the State to enjoin the Seneca-Cayuga and the Quapaw Tribes from conducting bingo games, the trial court resolved the controversy in favor of the Tribes by ruling that it lacked subject-matter jurisdiction. Causes were consolidated on appeal for disposition by a single opinion.

1. See footnote 9 *infra* for text of 18 U.S.C. § 1151.

2. See footnotes 43, 47 and 54 *infra*.

3. Affidavits, exhibits, and the trial court testimony of Jack Pate (Custodian of Records for the Tribes of the Miami Agency, Ottawa County, Oklahoma and Natural Resources Officer of the Bureau of Indian Affairs, Department of the Interior) established that the Seneca-Cayuga land involves 40 acres in Ottawa County, Oklahoma. The land had been allocated to a Seneca Indian, passed by will to another Seneca Indian, and then in 1945 was deeded back to the United States in trust for the Seneca-Cayuga Tribe pursuant to the purchase provisions of the "Oklahoma Welfare Act" of June 26, 1936, ch. 831, 49 Stat.1967 (codified as amended at 25 U.S.C. §§ 501 through 509 [1982]). Legal title is in the United States of America in trust for the Seneca-Cayuga Tribe, and beneficial title is in the Tribe.

State alleged that (a) the Tribes did not meet the requirements of a non-profit organization,[4] (b) were operating without a license,[5] (c) were operating on Sundays [6] and (d) offered prizes in excess of the limit authorized by state law.[7] Restraining orders were issued against both Tribes. The Seneca-Cayuga Tribe demurred to the State's petition and the Quapaw Tribe moved to dismiss the suit, both claiming tribal sovereign immunity and exclusive jurisdiction in the United States government. The Seneca-Cayuga also requested from the United States District Court for the Northern District of Oklahoma a temporary restraining order against the sheriff and district attorney. The State's injunction suits initially culminated in the trial court's dissolution of the restraining orders against both Tribes. At the conclusion of the second hearing the trial court resolved the controversy in favor of the Tribes. The same ruling was made in both causes: (1) the tracts of land were owned by the United States of America in trust for the Tribes; (2) the Tribes were recognized as such by the United States government; (3) the lands involved were "Indian Country" pursuant to 18 U.S.C. § 1151; (4) the State had not taken proper steps to acquire civil or criminal jurisdiction over "Indian Country"; and (5) the trial court had no jurisdiction over the lands involved.

The State brought separate appeals that were consolidated for disposition by a single opinion.

## I
## "INDIAN COUNTRY"

Both the Quapaw and Seneca-Cayuga claim federal recognition of their tribal status [8] and assert that the lands on which bingo is conducted are tribal trust allotments qualifying as "Indian Country".[9] The Tribes also claim that these lands were formerly accorded reservation status by the United States of America under super-

---

Exhibits and trial court testimony of Mr. Pate established similar trust status in favor of the Quapaw Tribe. The land in question is located in the Quapaw Industrial Park, Ottawa County, Oklahoma. It was originally allotted land which in 1937 was sold to the United States in trust for the use and benefit of the Quapaw Tribe pursuant to the purchase provisions of the Oklahoma Welfare Act.

4. The terms of 21 O.S. Supp.1983 § 995.1 require a bingo operator to be a " ... bona fide religious, charitable, labor, fraternal, educational organization or any branch, lodge, chapter, or auxiliary thereof or any veterans' or firemen's organization which operates without profit to its members, and provided that such organization has been in existence for not less than two (2) years prior to making application for license and is exempt from tax under ... Section 501 of the Internal Revenue Code of 1954 ... " The provisions of 21 O.S. Supp.1983 § 995.1(a) also require that a bingo license " ... shall not be leased or assigned to a commercial establishment."

5. The terms of 21 O.S. 1981 § 995.12 provide that "[n]o person, except a licensee operating pursuant to this act, shall conduct any game of bingo for which a charge is made or to the winner of which any prize is awarded".

6. The terms of 21 O.S. 1981 § 995.9 provide: "No bingo shall be conducted by any licensee on the first day of the week, commonly known ... as Sunday. No bingo shall be conducted between the hours of midnight and 10:00 a.m. on weekdays."

7. The terms of 21 O.S. 1981 § 995.10 limit the number of daily bingo sessions to one session per day, " ... each session not to exceed thirty bingo games per session nor may any licensee conduct bingo games in excess of two (2) days per week ... " Prizes are restricted to $100 for a single game and $500 for " ... the aggregate amount of all prizes offered or given in all games played on a single occasion ... "

8. In addition to other criteria cited in text *infra,* the Tribes refer to trial court testimony of Jack Pate, to support their claim of federal recognition. See footnote 3 *supra.*

9. "Indian Country" is defined in 18 U.S.C. § 1151 [1982] as follows:
"... (a) all land within the limits of any *Indian reservation* under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all *dependent Indian communities* within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all *Indian allotments,* the Indian titles to which have not been extinguished, including rights-of-way running through the same." [emphasis added]

vision of the Quapaw Indian Agency,[10] and that such status was never abolished or diminished by Congress or by judicial interpretation.[11]

## A. *Federal Recognition of Tribal Status*

■ We hold that both the Quapaw and Seneca-Cayuga are federally recognized tribes. Congressional authority to regulate commerce with Indian tribes has its origin in the United States Constitution.[12]

The Quapaw and Seneca-Cayuga Tribes are acknowledged by federal statutes [13] and are listed in the Federal Register.[14] Federal recognition may also be inferred by the Department of Interior's approval of tribal enactments or deference to Indian consent.[15]

Both the Seneca-Cayuga and Quapaw distinguish their history from that of the Five Civilized Tribes, claiming that the termination of their tribal status was not scheduled to occur with the disestablish-

**10.** In 1871 the Quapaw Indian Agency, now the Miami Agency, at the request of the Department of the Interior, began to oversee the affairs of several reservation tribes in eastern Indian Territory. M. Wright, A Guide to the Indian Tribes of Oklahoma 240 [1977]. These tribes include the Senecas and the Quapaws. See Wright, *supra* at 237 through 245 and 218 through 222.

**11.** The Quapaw were a tribe indigenous to the lower Arkansas River region. J. Swanton, The Indian Tribes of North America 213 through 215 [1968]. The Tribe claims reservation status under a series of treaties with the United States Government. Treaty of August 24, 1818, 7 Stat. 176; Treaty of November 15, 1824, 7 Stat. 232; Treaty of May 13, 1833, 7 Stat. 424. The latter treaty indicates that its purpose was to " ... provide a permanent home for their nation ... as long as they shall exist as a nation or continue to reside thereon ... " Treaty of May 13, 1833, Art. II, 7 Stat. 424. These lands, embracing those of several other tribes in eastern Indian Territory, including the Senecas, were described as a "reserve" or "reservation" in the Omnibus Treaty of February 23, 1867, Arts. 4 and 9, 15 Stat. 513.

After having fought the Indian General Allotment Act of 1887, see footnote 16 *infra*, the Quapaw alloted their lands at a meeting of the Quapaw National Council on March 23, 1893. Congress approved the allotment by Act of March 2, 1895, ch. 188, 28 Stat. 876, 907. In 1925 Congress authorized the sale of all tribal lands on any of the "reservations" within the Quapaw agency, on application of allottees or their heirs. Act of January 6, 1925, ch. 29, 43 Stat. 723. The Quapaw claim that approximately 500 acres of land described in the 1867 treaty remain intact today.

The Seneca-Cayuga, originally from New York, also claim reservation status through a long history of treaty-making with the United States government. *See generally* Wright, *supra* note 10 at 237 through 240. Various treaties united the previously distinct tribes in Ohio, after which time the tribes were collectively referred to as "Senecas". Wright, *supra* note 10 at 238. Treaty of September 29, 1817, 7 Stat. 160. After ceding their Ohio land to the United States, two

bands of Senecas united and, in 1832, came to Oklahoma where they were granted land, including the tract in question, "as long as they shall exist as a nation". Treaty on the Sandusky River, February 28, 1831, Art. 2, 7 Stat. 348; Treaty of July 20, 1831, 7 Stat. 351; Treaty of December 29, 1832, 7 Stat. 411. Title to the land also survived further changes in tribal affiliations and land holdings. Treaty of February 23, 1867, 15 Stat. 513.

**12.** " * * * Representatives and direct Taxes shall be apportioned among the several States ... excluding Indians not taxed. * * * " Art. I, § 2, U.S. Const. "The Congress shall have Power *To ... regulate commerce* with foreign nations, and among the several states, and *with the Indian tribes.*" [emphasis added] Art. I, § 8, U.S. Const. (also known as the Indian Commerce Clause).

**13.** *See* "Oklahoma Welfare Act" of June 26, 1936, *supra* note 3; Indian Reorganization Act of 1934 (also known as the Wheeler-Howard Act), Act of June 18, 1934, ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. §§ 461 et seq. [1982]).

**14.** For a complete list of federally-recognized tribes located in Oklahoma, *see* 47 Fed.Reg. 53130, 53132 and 53133 [1982].

**15.** The Seneca-Cayuga adopted a Constitution and Bylaws which were approved by the Department of the Interior on April 26, 1937 pursuant to Section 3 of the "Oklahoma Welfare Act" of June 26, 1936, *supra* note 3. Copies of the Constitution and Bylaws were submitted to the trial court.

Sale of Quapaw lands, authorized by Congress in 1925, was subject to tribal consent. Act of January 6, 1926, ch. 29, 43 Stat. 723. The Quapaw Tribal Governing Resolution was adopted on August 19, 1956, and approved by the Bureau of Indian Affairs on September 20, 1957. The Quapaw Tribal Membership Ordinance, enacted July 17, 1977 and amended July 16, 1978, was approved by the Bureau of Indian Affairs on December 20, 1979.

ment and assimilation of the Five Civilized Tribes.[16] We recognize that the history of the Quapaw and the Seneca-Cayuga diverges from that of the Five Civilized Tribes, with federally-acknowledged status of the Quapaw and Seneca-Cayuga continuing in force. To the extent that extant Oklahoma case law may be construed to reach a contrary conclusion, it is hereby disapproved and withdrawn.[17]

**16.** Because the State argues that *all* tribes in Indian Territory were disestablished by a series of events culminating in Oklahoma statehood, citing as authority *Ex parte Nowabbi,* 60 Okl.Cr., 111, 61 P.2d 1139 [1936] and Oklahoma Attorney's General Opinion No. 79–216 [December 31, 1979], we note briefly the history of the Five Civilized Tribes in comparison with the tribes of the Quapaw Indian Agency. Most of the historical references derive from the excellent sketches in *Harjo v. Kleppe,* 420 F.Supp. 1110 [D.C. 1976], *aff'd. sub nom, Harjo v. Andrus,* 581 F.2d 949 [D.C.Cir.1978] (hereinafter referred to as Harjo v. Kleppe), and in F. Cohen, Handbook of Federal Indian Law, 770 through 784 [1982 ed.].

The Five Civilized Tribes (Creek, Cherokee, Seminole, Choctaw and Chickasaw) came to Oklahoma following the Indian Removal Act of 1830. *Harjo v. Kleppe, supra* at 1119. Before the Civil War, these tribes owned most of the present-day Oklahoma, but because of their alliance with the Confederacy, were penalized by forced cession of their western lands to the federal government. Their remaining lands came to be known as "Indian Territory". *Harjo v. Kleppe, supra.*

Increasing white settlement had created a demand for allotment of Indian lands, resulting in passage of the "Indian General Allotment Act" (also known as "The Dawes Act" or the "Dawes Severalty Act"). Act of February 8, 1887, ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. § 331 et seq. [1982]). The purpose of the Act was to distribute tribal lands to reservation Indians for eventual resale to white settlers. Although individual allottees were subject to state or territorial laws (both civil and criminal), after the issuance of trust patents the Act was amended in 1906 to postpone such jurisdiction until the trust period expired and fee simple patents were issued. Act of May 8, 1906, ch. 2348, 34 Stat. 182 (codified at 25 U.S.C. § 349 [1982]). See *Ahboah v. Housing Authority of the Kiowa Tribe,* Okl., 660 P.2d 625, 628 [1983]. The Act exempted the lands of the Five Civilized Tribes, but the tribes of the Quapaw Indian Agency came within the terms of the Act and their lands were allotted at that time or shortly thereafter. *Harjo v. Kleppe, supra* at 1121 through 1122. (Note that the Quapaw Tribe, which had resisted the allotment policy, by tribal action allotted their own lands in 1893 and received congressional approval in 1895). See footnote 11 *supra.*

With the creation of Oklahoma Territory in 1890 (Organic Act), the Five Civilized Tribes and the tribes of the Quapaw Agency were exempted as the unorganized Indian Territory under concurrent federal and tribal jurisdiction. Act of May 2, 1890, ch. 182, § 1, 26 Stat. 81. Because of frequent disputes between the Indian tribes and white settlers (who were rapidly growing in number), in 1895 Indian Territory was divided into *three judicial districts, with federal jurisdiction (both civil and criminal) over United States citizens, and in mixed cases over tribal citizens. These federal courts were to apply Arkansas law in the absence of federal statute. Harjo v. Kleppe, supra* at 1121.

With the Appropriations Act of June 7, 1897, ch. 3, 30 Stat. 62, federal law was extended to include Indians in Indian Territory, although tribal legislation was still recognized subject to Presidential approval or veto. Mention of the tribes of the Quapaw Indian Agency is omitted from the Appropriations Act. *Harjo v. Kleppe, supra* at 1121. Major legislation following the Appropriations Act of 1897 also omitted the tribes of the Quapaw Agency and dealt specifically with the Five Civilized Tribes. Organic Act of May 2, 1890, *supra* (creation of Oklahoma Territory); Enabling Act of June 16, 1906, ch. 3335, 34 Stat. 267 (providing for Oklahoma statehood).

The Curtis Act of June 28, 1898, ch. 517, 30 Stat. 495 (providing for forced allotments of lands held by the Five Civilized Tribes and termination of tribal status), finally rendered tribal law unenforceable in federal court, and the pre-existing tribal courts were abolished. Allotments for the Five Civilized Tribes were then completed by a series of congressional enactments. *Harjo v. Kleppe, supra* at 1121 through 1122.

**17.** *Ex parte Nowabbi, supra* note 16 at 1153 through 1156; Oklahoma Attorney's General Opinion No. 79–216, *supra* note 16. *Ex parte Nowabbi, supra* note 16, holding that Oklahoma could take jurisdiction over crimes committed by Indians in Indian Country, on which the Attorney's General Opinion relies, is based on pre-1948 law. The 1948 revised United States Code includes revisions found at 18 U.S.C. § 1151 (defining Indian Country) and § 1153 (The Major Crimes Act vesting jurisdiction in the United States for major crimes, e.g., murder, discussed in *Nowabbi, supra* note 16). Since enactment of the 1948 code, courts have been reluctant to exclude the lands of eastern Oklahoma tribes from application of federal law. See, e.g., *United States v. John,* 437 U.S. 634, 648 through 652, 98 S.Ct. 2541, 2548 through 2550, 57 L.Ed.2d 489 [1978] (federal law under the Major Crimes Act applied to Choctaws in Mississippi). For a thoughtful analysis of the *Nowabbi* decision and reasons to exclude it as a basis

### B. *Trust Allotments as "Indian Country"*

■ Underlying the trial court's refusal to assume state jurisdiction is the premise that the lands in question are "Indian Country" as defined by 18 U.S.C. § 1151. The definition of "Indian Country" is relevant to questions of both criminal and civil jurisdiction.[18] Although the trial court did not explain the basis for its ruling that the tracts in question are "Indian Country", the Tribes argue that the trial court's ruling should be upheld on the basis that the land qualifies either as an allotment or as a reservation, or both. We are persuaded that the land claimed by both Tribes is "Indian Country" within the meaning of an Indian Allotment under section (c) of the statute.

■ Indian allotments were originally lands owned by individual Indians held in trust by the United States or subject to statutory restrictions on alienation.[19] The test for "Indian Country" is whether the land was "validly set apart for the use of the Indians, as such, under the superintendence of the government", or whether the land was "excepted from the portion reserved to the public domain" at the time of allotment.[20] A trust allotment is "Indian Country"[21] and remains so irrespective of reservation boundaries.[22] An allotment restricted against alienation is "Indian Country".[23] So is a portion of an original Indian allotment now held in trust by the federal government for the benefit of a tribe.[24]

Although there has been some confusion regarding the allotment status of certain tribes in Indian Territory, including the Seneca and Quapaw, we entertain no doubt that the General Allotment Act applied to both tribes.[25] As tribal allotments, the lands in question—belonging to the Quapaw and Seneca-Cayuga—are "Indian Country" under 18 U.S.C. § 1151(c).

of state jurisdiction, see Cohen, *supra* note 16 at 777 through 780 and accompanying notes.

18. *DeCouteau v. District County Court*, 420 U.S. 425, 427, 95 S.Ct. 1082, 1084, 43 L.Ed.2d 300, n. 2 [1975], *reh'g denied*, 421 U.S. 939, 95 S.Ct. 1667, 44 L.Ed.2d 95 [1975]; *McClanahan v. State Tax Comm'n. of Arizona*, 411 U.S. 164, 177 through 178, n. 17, 93 S.Ct. 1257, 1265, n. 17, 36 L.Ed.2d 129, 139, n. 17 [1973].

19. *See generally*, Comment, Tribal Self Government and the Indian Reorganization Act of 1934, 70 Mich.L.Rev. 955, 959 through 960 [1972]. Allotment was an assimilationist policy designed to free tribal lands from communal ownership so that white settlers could homestead among individual Indian landholders. See footnote 16, *supra*. The allotment period lasted from 1887 (enactment of the "Indian General Allotment Act", *supra* note 16), to 1934 (enactment of the "Indian Reorganization Act", Act of June 18, 1934, *supra* note 13). Today "allotment" is a word of art describing land owned by the United States in trust for Indians, or owned by Indians subject to a restriction on alienation in favor of the United States. See Cohen, *supra* note 16 at 615 through 616.

20. *United States v. Pelican*, 232 U.S. 442, 449, 34 S.Ct. 396, 399, 58 L.Ed. 676 [1914].

21. *United States v. Pelican, supra* note 20; see also *C.M.G. v. State*, Okl.Cr., 594 P.2d 798, 801 [1979].

22. *Ahboah v. Housing Authority of the Kiowa Tribe, supra* note 16 at 628 through 629.

23. *State v. Burnett*, Okl.Cr., 671 P.2d 1165, 1166, 1168 [1983].

24. *State v. Littlechief*, Okl.Cr., 573 P.2d 263, 264 through 265 [1978].

25. See footnote 16, *supra,* for the Indian General Allotment Act. The Senecas of New York were excluded from the Indian General Allotment Act along with the Five Civilized Tribes and certain other tribes, but there is no evidence that the Oklahoma Senecas (known as the Senecas of the Sandusky) were excluded. See Wright, A Guide to the Indian Tribes of Oklahoma 238 [Univ. of Okla.Press. 1951]; D. Otis, The Dawes Act and the Allotment of Indian Lands 21 through 22 and 42 through 43 [1973]. The Seneca lands were mentioned as having been allotted in one of the appellate briefs in *Ex parte Nowabbi, supra* note 16 at 1144. The Quapaw allotments were held subject to the Indian General Allotment Act in a 1975 Department of the Interior Opinion. 82 Interior Dec. 640 [1975]. See also 34 Op.Atty.Gen. 439 [1925]. Litigation of tax issues has also involved Quapaw allotments. See e.g., *United States v. Ha-*

Hence we do not reach the issue whether the Quapaw and the Seneca-Cayuga lands are a "reservation" within the meaning of the statute.[26]

II

TRIBAL SOVEREIGN IMMUNITY

Although the Tribes urged as a defense the tribal sovereignty doctrine as a bar to the State's suit, the trial court did not address this question. Because an understanding of the concept of tribal immunity is essential to solving the present jurisdictional puzzle, we now turn to a brief analysis of the subject in light of its historical antecedents and modern-day usage.

### A. Development of Immunity Doctrine

The doctrine of tribal immunity[27] had its beginnings with Chief Justice John Marshall of the United States Supreme Court, who, in 1823, originated a theory similar to a landlord-tenant relationship for the interaction of the federal government with the Indian Tribes.[28] This analysis, expressed in terms of a wardship or dependent status,[29] prevented state encroachment on tribal activities within territorial confines, because Indian territory was considered a separate entity from the surrounding state.[30] Although Indian reservations did not technically acquire sovereign status equal to that of foreign powers, the government did come to view the tribes as sovereign nations.[31]

*llam,* 304 F.2d 620 [10th Cir.1962]; see generally, Cohen, *supra* note 16 at 617.

**26.** Since the lands in question, as trust allotments, fall within the definition of "Indian Country", and since most cases discussing jurisdiction involve Indian reservations which are also "Indian Country", we do not distinguish between individual trust allotments and reservations in terms of jurisdiction. *Ahboah v. Housing Authority of the Kiowa Tribe, supra* note 16 at 632, n. 34.

**27.** The standard of Indian tribal sovereignty is anomalous to the immunity concept in general, since both sister states and foreign nations are amenable to state laws, while tribes traditionally have not been so accountable. "Foreign Service Immunities Act of 1976", Act of October 21, 1976, 90 Stat. 2891, 2892, 2897 (codified at 28 U.S.C. §§ 1330, 1602, 1611 [1982]). (Foreign nations may be sued in either state or federal court for activities involving commercial intercourse or real property in the United States, and an implied waiver of immunity will not prevent suit). *Nevada v. Hall,* 440 U.S. 410, 416, 99 S.Ct. 1182, 1186, 59 L.Ed.2d 416 [1979]. (Non-accountability of a sovereign in its own courts does not also give immunity in another sovereign's courts). See also, *Morgan v. Colorado River Indian Tribe,* 103 Ariz. 425, 443 P.2d 421, 424, n. 1 [1968]. (Indian Tribe held immune from suit, but court noted that if the defendant had been a foreign nation, it could be sued in either state or federal court). For a discussion of the confusion surrounding "sovereign immunity" as applied to American Indian Tribes, *see generally,* Wright, Sovereignty: Indian Sovereignty and Tribal Immunity from Suit, 8 Am. Indian L.Rev. 401 [1982]. (The concept of sovereign immunity in the context of its English history and American adaptation is distinguished from immunity of sister states, foreign states and tribal custom).

**28.** *Johnson v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 541 [1823]. The court reasoned that conquest over the Indians resulted in white ownership and title to Indian lands, subject to a right of continued Indian occupancy use. *Johnson v. M'Intosh, supra,* 21 U.S. at 572 through 574.

**29.** In *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 [1831], the Court indicated that federal jurisdiction derived from the status of Indian tribes as "domestic dependent nations . . . in a state of pupilage", whose relationship with the United States resembled that of "a ward to his guardian". *Cherokee Nation* is generally considered the genesis case undergirding the concept of tribal immunity, but the justices split three ways on the question of immunity: (1) Tribes are domestic dependent nations; (2) Tribes are sovereign nations; and (3) Tribes have no sovereignty. Though *Cherokee Nation* did not clearly define the sovereign status of tribes, it did articulate some notion of tribal sovereignty in a four-justice bloc, this notion providing a stronger basis for the Indian sovereignty doctrine under the territorial analysis of *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 560, 8 L.Ed. 501 [1832]. *See generally,* Lytle, The Supreme Court, Tribal Sovereignty, and Continuing Problems of State Encroachment into Indian Territory, 8 Am. Indian L.Rev. 65, 69 [1981].

**30.** See, e.g., *United States v. Kagama,* 118 U.S. 375, 383 through 385, 6 S.Ct. 1109, 1111 through 1114, 30 L.Ed. 228 [1886].

**31.** See, e.g., *Ex parte Crow Dog,* 109 U.S. 556, 567, 3 S.Ct. 396, 403, 27 L.Ed. 1030 [1883]. (Because of the sovereignty doctrine, only a Tribe could punish the murder of one Indian by another on the reservation). *See generally,* Comment, Tribal Self-Government and the Indian Reorganization Act of 1934, 70 Mich.L.Rev. 935, 956 through 958 [1972].

## B. *Infringement upon Self-Government and Federal Preemption*

Through time and with the checkerboard development of Indian with non-Indian fee ownership, this strict territorial approach later proved awkward to apply.[32] Although some adherence to the immunity doctrine continues,[33] the strict territorial approach applied earlier has largely given way to two other tests developed by the United States Supreme Court since 1959 for assessment of Indian Country's amenability to state law:[34] infringement upon tribal self-government and preemption by federal action.

The infringement test allows state jurisdiction in cases not involving tribal self-government.[35] Preemption analysis recognizes inherent Indian sovereignty as "a backdrop against which the applicable treaties and federal statutes must be read",[36] but focuses on whether the state has been granted jurisdiction by the federal government.[37] Because of the many interests at stake, and because the traditional concept of tribal sovereignty could invalidate legitimate state authority, state regulatory interests must also be considered.[38]

32. See, e.g., *Organized Village of Kake v. Egan,* 369 U.S. 60, 71 through 75, 82 S.Ct. 562, 568 through 571, 7 L.Ed.2d 573 [1962].

33. In *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 [1978], a female tribal member sued the Tribe in federal court to prevent enforcement of a tribal ordinance. The ordinance, which she claimed was violative of the "Indian Civil Rights Act of 1968", *infra* note 43, denied tribal membership to children of tribal women who married nonmembers, but allowed membership to children of tribal men who married nonmembers. The Court held that since tribal forums were available and since the Indian Civil Rights Act did not expressly subject tribes to federal court jurisdiction in such civil actions, waiver of sovereign immunity could not be implied "but must be unequivocally expressed" to vindicate rights created under the Act. The right to habeas corpus relief under the Act did not by itself give rise to a general waiver of tribal immunity. *Martinez, supra* at 65, 66, 70 through 72, 98 S.Ct. at 1680 through 1681, 1683 through 1684.

34. *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 [1959]. For a discussion of modern decline in traditional common-law immunities, see Note, In Defense of Tribal Sovereign Immunity, 95 Harvard L.Rev. 1058, 1062 through 1069 [1982].

35. In *Santa Clara Pueblo v. Martinez, supra* note 33, 436 U.S. at 55 and 72, 98 S.Ct. at 1657 and 1684, *federal* court jurisdiction was denied, in spite of the "Indian Civil Rights Act of 1968", *infra* note 53, where a tribal membership dispute was found to be an internal tribal matter. In *Williams v. Lee, supra* note 34, 358 U.S. at 219 through 220 and 223, 79 S.Ct. at 270 through 272, where a non-Indian sought debt payment from a Navajo Indian Reservation couple, Arizona state jurisdiction was held to in-

fringe on tribal self-government. But see *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 151, 156, 100 S.Ct. 2069, 2080, 2082 through 2083, 65 L.Ed.2d 10 [1980], *reh'g. denied,* 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1172 [1980]. (State could tax on-reservation sale of cigarettes to non-Indians since such tax did not encroach on traditional tribal activities).

36. *McClanahan v. State Tax Comm'n. of Arizona, supra* note 18, 411 U.S. at 172, 93 S.Ct. at 1262.

37. *McClanahan v. State Tax Comm'n. of Arizona, supra* note 18 at 171, 93 S.Ct. at 1261 through 1262. (Sovereignty backdrop, coupled with federal treaty and state statute, suggested exemption of Navajo Indians from state income tax). *Warren Trading Post v. Arizona Tax Comm'n.,* 380 U.S. 685, 691, 85 S.Ct. 1242, 1246, 14 L.Ed.2d 165 [1965]. (Congress had preempted the field of Indian trading).

38. Specific "inquiry into the nature of the state, federal, and tribal interests at stake" is necessary to determine whether state authority would violate federal law. *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 144 through 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 [1980]. See also, *Washington v. Confederated Tribes of the Colville Indian Reservation, supra* note 35, 447 U.S. at 156, 100 S.Ct. at 2082 through 2083; *White Mountain Apache Tribe v. Arizona,* 649 F.2d 1274, 1278, 1283 through 1285 [9th Cir. 1981].
See, e.g., *Thomas v. Gay,* 169 U.S. 264, 273, 18 S.Ct. 340, 343, 42 L.Ed. 740 [1898], where the court upheld an Oklahoma territorial tax on cattle of non-Indian lessees of reservation lands. Although the tax had an indirect effect on Indians, the effect was too remote in comparison with the overriding state interest.

## III

## AUTHORITY OF STATES IN INDIAN COUNTRY:

## PUBLIC LAW 83-280

### A. *Public Law 83-280*

■ Generally speaking, states have authority over non-Indians in Indian Country unless there is a conflict with federal law.[39] States may also exercise authority over Indians and their activities outside Indian Country, but within Indian Country, state jurisdiction is limited under the two tests.[40] In some instances, Congress has specifically allowed the application of state standards,[41] but a continuing body of case law indicates that the areas of sanctioned state jurisdiction are growing.[42]

**39.** See, e.g., *United States v. McGowan,* 302 U.S. 535, 539, 58 S.Ct. 286, 288, 82 L.Ed. 410 [1938]; *Draper v. United States,* 164 U.S. 240, 247, 17 S.Ct. 107, 109, 41 L.Ed. 419 [1896]; *United States v. McBratney,* 104 U.S. 621, 624 (14 OTTO), 26 L.Ed. 869 [1882]. *See generally,* Cohen, *supra* note 16 at 352 through 356.

**40.** See *Warren Trading Post Co. v. Arizona Tax Comm'n., supra* note 37, 380 U.S. at 687, 85 S.Ct. at 1243.

**41.** *General state criminal and civil laws:* 18 U.S.C. § 1162 and 28 U.S.C. § 1360 [1982]. *Liquor standards:* 18 U.S.C. § 1161 [1982]. *State taxing jurisdiction:* 25 U.S.C. §§ 398, 398(c), 401 [1982]. *Foreclosure laws:* 25 U.S.C. § 491 [1982]. *Health and education:* 25 U.S.C. § 231; 20 U.S.C. §§ 631 through 647 [1982]. *Water rights:* 43 U.S.C. § 666 [1982]. (McCarran Amendment, as judicially interpreted, see *Jicarilla Apache Tribe v. United States, infra* note 42). *Environmental protection laws:* 33 U.S.C. §§ 1251 et seq. [1982]. (Water Pollution Control Act); 42 U.S.C. §§ 7401 through 7642 [1982]. (Clean Air Act). *Cooperative federal-state unemployment insurance:* I.R.C. §§ 3301 through 3311 [1985]. *Cooperative federal-state social welfare programs including social security and welfare benefits:* 42 U.S.C. §§ 301 through 1397(f) [1982]. *Child custody laws:* 25 U.S.C. §§ 1901 et seq. [1982]. (Indian Child Welfare Act of 1978).

Several statutes give Oklahoma courts jurisdiction in specific instances. *Partition and probate of real estate:* see 25 U.S.C. §§ 355, 375; *Oklahoma Indian Welfare Act:* 25 U.S.C. §§ 501 et seq. [1982]. *Child custody laws:* 10 O.S.Supp. 1983 §§ 40 et seq. (Oklahoma Indian Child Welfare Act—application of Federal Indian Child Welfare Act in Oklahoma). *Education:* 70 O.S.1981 § 3–104.

For a general discussion of the rising influence of state law, see *Organized Village of Kake v. Egan, supra* note 32, 369 U.S. at 73 through 74, 82 S.Ct. at 569 through 570.

**42.** Growing areas of state jurisdiction include the regulation of natural resources and taxation. *As to taxation, Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 482, 96 S.Ct. 1634, 1645 through 1646, 48 L.Ed.2d 96 [1976], held that on-reservation Indian retailers had to collect a state cigarette sales tax for sales made to non-Indians. (Indian exemptions create a competitive advantage that should not extend to non-Indian purchasers, thereby depriving states of a legitimate tax base). The Ninth Circuit has held that non-Indian lessees of Indian land may have to pay concurrent tribal and county possessory interest taxes. *Fort Mojave Tribe v. County of San Bernardino,* 543 F.2d 1253, 1258 [9th Cir.1976], *cert. denied,* 430 U.S. 983, 97 S.Ct. 1678, 52 L.Ed.2d 377 [1977]. *Crow Tribe of Indians v. State of Montana,* 650 F.2d 1104, 1116 [9th Cir.1981], *cert. denied,* 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 [1982], held that the state could impose a coal severance tax on non-Indian lessees of Indian land, since the tax did not interfere with tribal self-government. A state tax is not invalid merely because it erodes a tribe's revenues, even when the tax substantially impairs the tribal government's ability to sustain itself and its programs. *Crow Tribe of Indians v. State of Montana, supra* at 1116. *Washington v. Confederated Tribes of the Colville Indian Reservation, supra* note 35, 447 U.S. at 154 through 157, 100 S.Ct. at 2081 through 2083, held that Tribes could not market their tax exemption to non-Indians or to tribal nonmembers, even if the state tax created a loss of revenue sufficient to bankrupt the tribal cigarette sales business. Tribal versus state interests, when balanced, showed tribal interests were greatly lessened where most customers were non-Indian and received no services from the tribal revenues.

*Even on reservations,* state laws may be applied unless they interfere with reservation self-government or impair a federally-created right. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 [1973]. Regarding *regulation of natural resources,* courts have shown increasing favor toward an assimilationist view of Indian jurisdiction, indicating deference to concurrent or co-existing state law. *See generally,* Dwello, Recent Development in the Northwest Regarding Indian Water Rights, 20 Nat. Resources J. 101 [1980]. In *Washington v. Yakima Indian Nation,* 439 U.S. 463, 498, 99 S.Ct. 740, 760, 58 L.Ed.2d 740 [1979], *reh'g. denied,* 440 U.S. 940, 99 S.Ct. 1290, 59 L.Ed.2d 500 [1979], partial state jurisdiction was upheld as a responsible attempt to accommodate both state and tribal interests. Although there had been no constitutional amend-

Under Public Law 83–280 [hereinafter PL–280],[43] Congress, in 1953, provided a vehicle by which states could assume criminal and/or civil jurisdiction over any "Indian Country" without the consent of the tribe affected. So-called "mandatory" states were required to assume jurisdiction at the time of the law's passage.[44] "Optional" states consisted of "disclaimer" and "non-disclaimer" states. Disclaimer states (of which Oklahoma is one)[45] were those whose enabling acts and constitutions disclaimed all title to and interest in Indian lands within state borders; non-disclaimer states were not barred by such language.[46] Since the enabling act disclaimers were removed by Congress through passage of PL–280,[47] only the state constitutional disclaimers needed removal by amendment, "where necessary", and by affirmative legislative action.[48]

Although Oklahoma has not taken formal steps to remove its constitutional disclaimer, recent cases suggest that repeal of the disclaimer may not be necessary.[49]

ment to confer PL 83–280 jurisdiction, "PL–280 was intended to facilitate, not impede the transfer of jurisdictional responsibility to the States". *Washington v. Yakima Indian Nation, supra* note 42 at 490, 99 S.Ct. at 756. *White Mountain Apache Tribe v. Arizona, supra* note 38 at 1280, 1283 through 1284, held that a disclaimer state could require non-Indians on a reservation to pay state fishing and hunting fees, since the state's strong interest in preserving wildlife overrides a disclaimer. The mere presence of a disclaimer does not justify treating a disclaimer state differently from a state without a disclaimer, and the state can regulate fishing by off-reservation Indians, since disclaimers are limited to matters of a proprietary nature. *Organized Village of Kake v. Egan, supra* note 32, 369 U.S. at 69 through 75, 82 S.Ct. at 567 through 571. See also, *Jicarilla Apache Tribe v. United States,* 601 F.2d 1116, 1135 [10th Cir.1979], *cert. denied,* 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 [1979]. (McCarran Amendment authorized disclaimer state, on entering the Union, to assume jurisdiction over federally reserved Indian water rights).

**43.** Public Law 280 was originally enacted as Act of August 15, 1953, ch. 505, 67 Stat. 588 through 590 (codified as amended at 18 U.S.C. § 1162, 28 U.S.C. § 1360 [1982]); reenacted in Indian Civil Rights Act of 1968, Act of April 11, 1968, 82 Stat. 77 (codified as amended at 25 U.S.C. §§ 1301 through 1303 [1982]). *See generally,* Goldberg, Public Law 280: The Limits of State Jurisdiction over Reservation Indians, 22 UCLA L.Rev. 535 [1975].

**44.** 18 U.S.C. § 1162(a); 28 U.S.C. § 1360(a) [1982]. Mandatory states today are Alaska, California, Minnesota, Nebraska, Oregon and Wisconsin.

**45.** Enabling Act, Act of June 16, 1906, *supra* note 16; Art. I § 3, Okl.Const. Article I § 3 provides: "The people inhabiting the State do agree and declare that they forever disclaim all rights and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States".

**46.** 82 Stat. 78 through 79 (codified at 25 U.S.C. §§ 1321, 1322 and 1326 [1982]).

**47.** The pertinent language of PL–280 § 6 provides: "Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes ..." 67 Stat. 590 (codified at 25 U.S.C. § 1324 [1982]). Counsel for the House Committee on Interior and Insular Affairs stated at PL–280 hearings that "[n]otwithstanding the provisions of any Enabling Act" meant Congress was repealing the Enabling Act. *Goldberg, supra* note 43 at 572, n. 168. See also, *Washington v. Yakima Indian Nation, supra* note 42, 439 U.S. at 487 through 488 and 493, 99 S.Ct. at 755 and 757.

**48.** *Washington v. Yakima Indian Nation, supra* note 42, 439 U.S. at 487 and 488, 99 S.Ct. at 754 through 755.

**49.** Disclaimers only represent proprietary interest in land, not governmental interest. *Organized Village of Kake v. Egan, supra* note 32, 369 U.S. at 69, 82 S.Ct. at 562, 567. Alaska disclaimer language reserving "absolute jurisdiction" in Congress over Indian lands was held to mean "undiminished", not "exclusive" jurisdiction. *Egan, supra* note 32, 363 U.S. at 71, 82 S.Ct. at 568 through 569. Note that the "absolute jurisdiction" language of the Alaska Statehood Act does not appear in the earlier Oklahoma Enabling Act, § 3 (Third), 34 Stat. 269. See notes 16 and 45 *supra.* The Oklahoma Enabling Act recites that Indian lands remain "subject to the jurisdiction, disposal and control of the United States", thus avoiding extinguishment of reserved state powers at the time of statehood. This language was interpreted to mean that "jur-

Even should state law indicate repeal, it has been held that the barrier posed by constitutional amendment may be removed by other state action.[50] This court has adopted this principle,[51] emphasizing that the disclaimer is one of "proprietary" rather than "governmental" interest.[52]

■ Before its amendment in 1968,[53] PL–280 also required that the states wishing to assume jurisdiction take "affirmative legislative action".[54] When Congress amended the Civil Rights Act in 1968,[55] it removed this prerequisite to the state's assumption of jurisdiction, but imposed an-

isdiction" in the Oklahoma Enabling Act did not mean exclusive jurisdiction in the federal government. *Egan, supra* note 32, 369 U.S. at 69, 71, 82 S.Ct. at 567 through 569. See also, State ex rel. *McDonald v. District Court,* 159 Mont. 156, 496 P.2d 78, 82 [1972]. ("Absolute" jurisdiction cannot mean "exclusive" jurisdiction, since states are never outside the absolute control of Congress, which may repeal PL–280 at any time and return exclusive jurisdiction to itself). See also, *Paiz v. Hughes,* 76 N.M. 562, 417 P.2d 51, 53 [1966]. (Indians may seek and obtain state jurisdiction where it is not preempted by federal action); *State ex rel. Iron Bear v. District Court,* 162 Mont. 335, 512 P.2d 1292, 1296 through 1297 [1973]. (Pre-existing state jurisdiction continues unless preempted by Act of Congress or infringement on tribal self-government); *Tonasket v. State,* 84 Wash.2d 164, 525 P.2d 744, 752 through 753 [1974], *appeal dismissed,* 420 U.S. 915, 95 S.Ct. 1108, 43 L.Ed.2d 387 [1975]. (Whether constitutional amendment is necessary to comply with PL–280 is question for state resolution).

50. *Tonasket v. State, supra* note 49, 525 P.2d at 753. (U.S. Supreme Court remanded question to the state, which held that "where necessary" language establishes an inference that "the question of whether a state constitutional amendment be necessary to comply with Public Law 83–280 is essentially one for state resolution"). See also, *Washington v. Yakima Indian Nation, supra* note 42, 439 U.S. at 493 and 499, 99 S.Ct. at 757 and 760; *Quinault Tribe v. Gallagher,* 368 F.2d 648, 653 [9th Cir.1966], *cert. denied,* 387 U.S. 907, 87 S.Ct. 1684, 18 L.Ed.2d 626 [1967]; *Makah Indian Tribe v. State,* 76 Wash.2d 485, 457 P.2d 590, 593 [1969]; *appeal dismissed,* 397 U.S. 316, 90 S.Ct. 1115, 25 L.Ed.2d 335 [1970]; *State ex rel. McDonald v. District Court, supra* note 49, 496 P.2d at 82.

51. *Ahboah v. Housing Authority of the Kiowa Tribe, supra* note 16, 660 P.2d at 630.

52. *Ahboah v. Housing Authority of the Kiowa Tribe, supra* note 16, quoting *Currey v. Corporation Comm'n.,* Okl., 617 P.2d 177, 182 [1980], *cert. denied,* 452 U.S. 938, 101 S.Ct. 3080, 69 L.Ed.2d 952 [1981], *reh'g. denied,* 453 U.S. 927, 102 S.Ct. 890, 69 L.Ed.2d 1023 [1981]. See also, *Organized Village of Kake v. Egan, supra* note 32, 369 U.S. at 69 through 70, 82 S.Ct. at 567 through 568. (Congressional discussion at the time of the Alaska Statehood Act showed that

there was no intent to disclaim State "political or police power with respect to the actions of people on ... [Indian] land, as long as that does not affect the title to the land", resulting in disclaimer of proprietary interests).

53. "Indian Civil Rights Act of 1968", Act of April 11, 1968, PL 90–284, 82 Stat. 77 (codified as amended at 25 U.S.C. §§ 1301, 1302 and 1303 [1982].

54. Pertinent provisions of PL–280, *supra* note 43, are:
"Sec. 4. Title 28 United States Code, is hereby amended by inserting ... a new section, to be designated as section 1360 as follows:

\* \* \* \* \* \*

'(a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian county ... to the same extent that such State has jurisdiction over other civil causes of action ...'

\* \* \* \* \* \*

Sec. 7. The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by *affirmative legislative action,* obligate and bind the State to assumption thereof." [emphasis added]

55. The terms of the 1968 Civil Rights Act, *supra* notes 43 and 53, provide in pertinent part:
"Sec. 402. (a) The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, *with the consent of the tribe occupying the particular* Indian country or part thereof which would be affected by such assumption ...

\* \* \* \* \* \*

Sec. 403. (b) *Section 7 of the Act of August 15, 1953 (67 Stat. 588), is hereby repealed,* but such repeal shall not affect any cession of jurisdiction made pursuant to such section prior to its repeal.
Sec. 404. Notwithstanding the provisions of any enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where

other requirement—i.e. that those states which have not extended criminal or civil jurisdiction to Indian Country can make future extensions only with the consent of the tribes affected.[56] Because, under the "Indian Commerce Clause", Congress enjoys exclusive authority to regulate Indian affairs,[57] the states are powerless to shape their own relationship with the Indian Tribes where the federal scheme has preempted state involvement. Thus, where Congress has spoken, state courts must act accordingly. Any assumption of state jurisdiction pursuant to PL–280 must comply with that enactment's procedural requirements.[58]

■ There appear to be several impediments in this case to the State's assumption of jurisdiction under PL–280. First, the State has demonstrated neither that it acquired jurisdiction prior to the 1968 requirement of tribal consent, nor that the Tribes have consented to the State's assumption of jurisdiction. Lastly, tribal consent alone, even if present, would not be enough to clothe the State with jurisdiction over Indian Country. More is required. Whether a state has under the current version of PL–280 validly asserted concurrent jurisdiction must be demonstrated by the means used in effecting a transfer of jurisdiction. Although a disclaimer state— such as Oklahoma—need not amend its constitution, the U.S. Supreme Court, in a

post-1968 opinion, stated that it must still " ... take positive action before Pub L 280 jurisdiction can become effective ...."[59] This, we believe, means that there must be some action by the State indicating its willingness and ability to discharge its responsibilities under this Law by either partial or full assumption of jurisdiction. We are unable to identify and isolate any state governmental action which amounts to an assumption of cognizance over Indian Country.

Because the Tribes cannot consent to the State's assumption of jurisdiction over federally-preempted subject-matter—and a State may not accept it—the PL–280-authorized tribal consent applies only to those incidents of cognizance that effect an infringement upon tribal self-government. If neither preemption nor infringement is involved, then the test shifts from one of "strict compliance with PL–280" to the presence of state residuary powers.

## B. *"Residuary" or "Residual" State Jurisdiction*

The concept of "residuary" jurisdiction is used to invest state courts with jurisdiction interstitially when the subject-matter of cognizance does not infringe upon tribal self-government and has not been preempted by congressional legislation.[60]

necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil or criminal jurisdiction in accordance with the provisions of this title ...

\* \* \* \* \* \*

Sec. 406. State jurisdiction acquired pursuant to this title with respect to criminal offenses or civil causes of action, or with respect to both, shall be applicable in Indian country *only where the enrolled Indians* within the affected area of such Indian country *accept such jurisdiction by a majority vote of the adult Indians voting at a special election* held for that purpose ..." [emphasis added]

**56.** See footnote 55 *supra.*

**57.** Art. I, § 8, cl. 3, U.S. Const.; see footnote 12 *supra.*

**58.** *Kennerly v. District Court,* 400 U.S. 423, 424 through 425, 91 S.Ct. 480, 481, 27 L.Ed.2d 507 [1970].

**59.** *Washington v. Yakima Indian Nation, supra* note 42, 439 U.S. at 493, 99 S.Ct. at 757.

**60.** E.g., *Three Affiliated Tribes v. Wold Engineering,* 467 U.S. 138, 104 S.Ct. 2267, 2278 through 2279, 81 L.Ed.2d 113 [1984]; *State ex rel. Iron Bear v. District Court,* 162 Mont. 335, 512 P.2d 1292, 1296 through 1298 [1973].
On the state's assumption of jurisdiction under its residuary powers, the state police power is automatically operative in the absence of congressional action. *Organized Village of Kake v. Egan, supra* note 32, 369 U.S. at 75, 82 S.Ct. at 570 through 571; *Jicarilla Apache Tribe v. United States, supra* note 42 at 1135, quoting *Mescalero Apache Tribe v. Jones, supra* note 42.

The jurisdictional question before us addresses itself to the impact of state bingo regulations on tribal self-government in Indian Country. State exercise of claimed residuary powers must rest on a showing that state intrusion will not interfere with tribal self-government. For the reason to be stated, the resolution of this issue presents a mixed issue of law and fact.

In Part IV, *infra*, we discuss generally the impact on the non-Indian community of tribal activity within Indian Country. We do not regard state regulation of bingo games as constituting *per se* infringement upon the exercise of tribal self-government; rather, we use a balancing approach to resolve the competing tribal and state interests. After balancing the State's regulatory interest, the tribal stake in self-government and the federal policies and legislation, we are led to conclude that state residuary jurisdiction may be exercised only to the extent that tribal activity in Indian Country takes on a form that necessarily affects non-Indians and Indians who are nonmembers of the self-governing tribal unit.

## IV
## INFRINGEMENT UPON TRIBAL SELF–GOVERNMENT VIS–A–VIS THE STATE'S RESIDUARY POWERS

A. *Impact of Tribal Activity Within Indian Country on the Non-Indian Community*

The legislative history of PL-280 sheds little light on congressional intent regarding state power on Indian lands over public actions such as licensing, land use regulation, and taxation of tribal activities.[61] As Indians develop new and profitable enterprises, their activities have come to have increasing impact outside Indian Country, and courts are showing greater willingness to accommodate state interests where the challenged activity might negatively affect the larger non-Indian community.[62] Most past litigation has centered on the "encumbrance" concept in PL–280 [63] which prohibits state exploitation and alienation of Indian lands.[64] Many courts have adopted the view that Indian immunities should not be given to outsiders, and that the "encumbrance prohibition" never withheld from a state its police power to prevent injury (or even the appearance of injury) to the surrounding area or its population.[65] In mat-

**61.** See e.g., *Bryan v. Itasca County*, 426 U.S. 373, 379, 96 S.Ct. 2102, 2106, 48 L.Ed.2d 710 [1976], where the court noted: "The primary concern of Congress in passing Pub.L. 280 ... was ... the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement". See also Goldberg, *supra* note 43 at 577 through 578.

**62.** Goldberg, *supra* note 43 at 584 through 585.

**63.** PL–280, §§ 2(b) and 4(b) (codified at 28 U.S.C. § 1360(b) and 18 U.S.C. § 1162(b) [1982] ) provides:
"Nothing in this section shall authorize the alienation, *encumbrance*, or taxation *of any real or personal property*, including water rights, *belonging to any Indian or any Indian tribe*, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal trea-

ty, agreement, or statute or with any regulation made pursuant thereto: ..." [emphasis added]

**64.** *Rincon Band of Mission Indians v. County of San Diego*, 324 F.Supp. 371, 376–377 [S.D.Cal. 1971], reversed on other grounds, 495 F.2d 1 [9th Cir.1974], *cert. denied*, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 [1974]. ("Encumbrance" denotes the concept used to protect Indians from exploitation and alienation of their lands).

**65.** E.g., *Agua Caliente Band of Mission Indians' Council v. City of Palm Springs*, 347 F.Supp. 42, 49 [D.C. Cal.1972], vacated on other grounds and remanded by unpublished order of the U.S. Court of Appeals for the Ninth Circuit on January 24, 1975; *Rincon Band of Mission Indians v. County of San Diego, supra* note 64 at 376 through 378. *Accord, Snohomish County v. Seattle Disposal Co.*, 70 Wash.2d 668, 425 P.2d 22, 28 [1967] (Hale, J., dissenting), *cert. denied*, 389 U.S. 1016, 88 S.Ct. 585, 19 L.Ed.2d 662 [1967].

ters involving large numbers of non-Indians, both Indian and State interests should be balanced against each other.[66]

As for the case at bar, substantial numbers of non-Indians could be involved. A hearing on the jurisdictional issue in contest would reveal to what extent the commercial operation here in litigation touches persons other than tribal members and affords them immunity from state laws. In addition to circumventing state policy and law, non-Indian immunity from state law may negatively affect the state's economy by depressing legitimate business activities that provide tax revenue for all citizens, both Indian and non-Indian.

B. *The Balancing Approach to State Regulation of Bingo Games Conducted on Indian Country*

Some cases that discuss the issue of state regulation of bingo games try to distinguish between the "civil regulatory" or "criminal prohibitory" nature of bingo laws [67] in order to determine whether the state may assume jurisdiction. We find the distinction unpersuasive because it provides no clear distinction between "regulatory" and "prohibitory" as applied to bingo. Most regulations may be interpreted as

being in both categories. Because this case involves an overlapping of state, Indian and federal interests, we resort to a balancing approach for resolution of the conflict.[68]

■ First we ask: Are state regulations of bingo preempted by federal law since there are no federal treaties, statutes, regulations or policies concerning the conduct of bingo games on tribal lands? Here we must answer in the negative.

■ Next we ask: Does state regulation of tribal bingo games conducted in Indian Country constitute *per se* an infringement upon Indian self-government? Here we are unable to ascertain that bingo is a traditional tribal activity or one involving essential tribal functions, and hence we must again give a negative answer.

The main (and perhaps only) purpose of the enterprise is to generate funds for the Tribes. We do recognize that the Tribes have a legitimate interest in self-government and economic development.[69] We also recognize that the U.S. Supreme Court has extended state laws to tribal commercial activities affecting substantial numbers of non-Indians, where such non-Indian citi-

---

**66.** In *Washington v. Confederated Tribes of the Colville Indian Reservation, supra* note 35, 447 U.S. at 156, 100 S.Ct. at 2083, the Court stated that "[t]he principle of tribal self-government, grounded on notions of inherent sovereignty and in congressional policies, seeks an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other".

**67.** See e.g., *Seminole Tribe of Florida v. Butterworth,* 491 F.Supp. 1015, 1019 [S.D.Fla.1980], cert. denied, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 [1982]; *Oneida Tribe of Wisconsin v. Wisconsin,* 518. F.Supp. 712, 717 [W.D.Wisc. 1981] (bingo laws are civil regulatory in nature). But see, *United States v. Marcyes,* 557 F.2d 1361, 1363 through 1364 [9th Cir.1977] (fireworks laws are criminal-prohibitory); *Penobscot Nation v. Stilphen,* 461 A.2d 478, 483 [Me.1983], *appeal dismissed,* 464 U.S. 923, 104 S.Ct. 323, 78 L.Ed.2d 296 [1983] (balancing of interests must be applied regardless of whether State attempted to prohibit or merely to regulate gambling, and there was no showing of federal common-law right to operate "beano" games on reservation in violation of state law).

**68.** See, *Washington v. Confederated Tribes of the Colville Indian Reservation, supra* note 35, 447 U.S. at 156, 100 S.Ct. at 2083 and *supra* note 66; *Rice v. Rehner,* 463 U.S. 713, 103 S.Ct. 3291, 3296 through 3297, 77 L.Ed.2d 961, 970 [1983]; *Penobscot Nation v. Stilphen, supra* note 67 at 483. Cf. *Agua Caliente Band of Mission Indians v. City of Palm Springs, supra* note 65 at 50 (attributes of sovereignty may be overridden by Acts of Congress and in some cases by state laws); *Rincon Band of Mission Indians v. County of San Diego, supra* note 64 at 378 (limited Indian self-government may not challenge state law).

**69.** See, Indian Reorganization Act of 1934, *supra* note 13; Oklahoma Indian Welfare Act of 1936, *supra* note 13; Indian Civil Rights Act of 1968, *supra* note 43; Indian Financing Act of 1974, 88 Stat. 77 (codified at 25 U.S.C. §§ 1451 et seq. [1982]); Indian Self-Determination and Education Assistance Act of 1975, 88 Stat. 2203 (codified at 25 U.S.C. §§ 450 et seq. [1982]).

zens evade state laws by benefiting from an exclusively Indian exemption.[70] Our analysis of extant U.S. Supreme Court jurisprudence leads us to conclude that the earlier doctrine of Indian wardship, as conceptually refined, continues to provide Indians with a measure of autonomy and self-determination within the practical confines and realities of modern American life. American Indians enjoy many rights as citizens, both of the United States and of the States in which they reside.[71] Efforts at economic development and tribal self-government are encouraged, but not at the expense of the states in which they reside and in disregard of those laws that protect both Indian and non-Indian citizens.[72]

Federal interest in protecting the Indians from feared state hostility continues to manifest itself in the presence of many statutory exemptions. That these exemptions will not be extended to non-Indians, especially where they are potentially injurious to state interests, is not inconsistent with the federal government's guardianship philosophy.

Bearing in mind that many Indian tribes are now striding toward greater economic stability by experimenting with new forms of revenue-raising, recent case law recognizes that states *do* have interests which must be considered in clarifying undecided areas of law. No one would deny that states have a legitimate interest in preventing infiltration of organized crime and in protecting the State's overall economy and tax base.[73] State statutes, such as Oklahoma's bingo law, which fashion norms for conduct[74] throughout the state, have a beneficial impact on all citizens, both Indian and non-Indian. They do regulate activities which, if left unguarded, might encourage organized crime and siphon off needed state revenues that provide resources for services utilized by the Indians themselves.

## SUMMARY

The Quapaw and the Seneca-Cayuga are federally-recognized Tribes whose lands, upon which bingo games are conducted, are "Indian Country" under the allotment definition of 18 U.S.C. § 1151(c). Tribal sovereignty is not a bar to state jurisdiction, although states must meet the modern tests for measuring infringement upon tribal self-government and federal preemption. Because bingo cannot be viewed as a traditional tribal activity—an operation which is, or has been, *essential*

70. *Moe v. Salish & Kootenai Tribes, supra* note 42, 425 U.S. at 482, 96 S.Ct. at 1645 through 1646; *Washington v. Confederated Tribes of the Colville Indian Reservation, supra* note 35, 447 U.S. at 155 and 157, 100 S.Ct. at 2083.

71. Since 1924 Indians born in the United States have been recognized as United States citizens. Act of June 2, 1924, ch. 233, 43 Stat. 253 (codified as carried forward at 8 U.S.C. § 1401(b)). They are also citizens of the state in which they reside, a status derivative of national citizenship under the Fourteenth Amendment, U.S. Const. See *Goodluck v. Apache County,* 417 F.Supp. 13, 14 [D.Ariz.1975], *aff'd.,* 429 U.S. 876, 97 S.Ct. 225, 50 L.Ed.2d 160 [1976]. Court decisions have upheld numerous rights of Indians as state citizens, including the right to vote in state elections, hold state public offices, receive state-supported welfare benefits, and attend state-supported public schools. See Cohen, *supra* note 16 at 639, 645 through 646. See also *Moe v. Salish & Kootenai Tribes, supra* note 42, 425 U.S. at 467, 96 S.Ct. at 1638; *Rincon Band of Mission Indians v. County of San Diego, supra* note 64 at 375.

72. *Rincon Band of Mission Indians v. County of San Diego, supra* note 64 at 377. (Any activity classified as criminal conduct may be lucrative and thus arguably supportive of Indian autonomy and economic development; but states are not limited to jurisdiction solely over unprofitable criminal acts).

73. See, *United States v. Farris,* 624 F.2d 890, 894 [9th Cir.1980], *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 839 [1981]. (State gambling laws will be upheld to protect interstate commerce and prevent takeover of legitimate organizations by organized crime); *Washington v. Confederated Tribes of the Colville Indian Reservation, supra* note 35, 447 U.S. at 157, 100 S.Ct. at 2083. (The state has a legitimate governmental interest in raising revenues that is strongest when the tax is directed at off-reservation value and when taxpayers are recipients of state services).

74. See, *Rincon Band of Mission Indians v. County of San Diego, supra* note 64 at 377. (A county card room ordinance was held to regulate conduct, not land use).

to tribal self-government—we find no infringement *per se.* Neither has state regulation been preempted by federal law, because there are no existing federal treaties, statutes, regulations or policies governing the conduct of bingo games on Indian lands.

Additionally, the formal barriers of PL–280 do not constitute an absolute bar to state jurisdiction. There is no evidence of congressional intent to increase barriers to state jurisdiction; and federal case law, over time, has tended to allow greater state jurisdiction over commercially-oriented Indian activities. Recent cases clearly recognize that PL–280 barriers prevent jurisdiction of a "proprietary", not "governmental", nature, with residuary state powers continuously operative where federal law is silent. This dispute presents a "governmental" matter affecting a potentially large segment of the state's citizenry. The State's bingo laws cannot be said to be an "encumbrance" on Indian lands, since the statute is aimed at conduct, not land use.

In conclusion, we hold that the State regulation of bingo games conducted in Indian Country is permissible only if, and to the extent that, the activity is shown to affect non-Indians and Indians who are nonmembers of the self-governing unit.[75] Because a determination of the State's residuary jurisdictional powers presents here a mixed issue of law and fact, the causes must be remanded for its resolution after an evidentiary hearing.[76]

The trial court's order refusing to assume subject-matter jurisdiction is reversed and the causes are remanded for further proceedings not inconsistent with this pronouncement.

75. *Rice v. Rehner, supra* note 68, 103 S.Ct. at 3296, n. 7. In *Washington v. Confederated Tribes of the Colville Indian Reservation, supra* note 35, 447 U.S. at 161, 100 S.Ct. at 2085, the Court held that Indians resident on the reservation but nonmembers of the governing tribe "stand on the same footing as non-Indians resident on the reservation" insofar as imposition of tax on cigarette sales is concerned. Regulation of sales to non-Indians or nonmembers of the self-governing tribal unit was deemed not to

SIMMS, C.J., DOOLIN, V.C.J., and HODGES, LAVENDER, HARGRAVE, ALMA WILSON and SUMMERS, JJ., concur.

KAUGER, J., concurs in part and dissents in part.

contravene the principle of tribal self-government.

76. While the trial court held hearings to determine the status of the *locus in quo* as Indian Country, *no* evidence was taken on whether the bingo activity the State seeks to regulate invites and induces participation by non-Indians and Indians who are nonmembers of the self-governing unit or is conducted as an internal and private tribal affair.