2000 OK 54

MESSER–BOWERS COMPANY, INC., Mark M. Mayo, Trustee of the Mark M. Mayo Revocable Trust dated November 30, 1994, Wilma J. Mayo, also known as Billie J. Mayo, Trustee of the Wilma J. Mayo Revocable Trust dated December 21, 1994, and Floyd Sears, Appellants,

v.

STATE of Oklahoma ex rel. OKLAHOMA WATER RESOURCES BOARD, and Kronseder Farms, Inc., Appellees

No. 90,783.

Supreme Court of Oklahoma.

July 5, 2000.

Clark McKeever, Enid, Oklahoma, for Appellants.

Dean A. Couch, Oklahoma City, Oklahoma, for Appellee, Water Resources Board.

James R. Barnett, R. Thomas Lay, Kerr, Irvine, Rhodes & Ables, Oklahoma City, Oklahoma, for Appellee, Kronseder Farms.

W.A. Drew Edmondson, Attorney General, Cannon Miles Tolbert, Assistant Attorney General, Oklahoma City, Oklahoma, Amicus Curiae.

HODGES, J.

¶1 This appeal raises several issues surrounding the decision of the Oklahoma Water Resources Board (Water Board) to issue a groundwater use permit for land on which Kronseder Farms, Inc. (Kronseder), plans to construct a concentrated swine feeding operation. For the reasons below, this matter is remanded to the Water Board for an evidentiary hearing which conforms to today's decision.

¶2 In February,1996, Kronseder applied to the Water Board for a permit to withdraw 4,520 acre feet of groundwater per year from 45 proposed wells located on 4,520 acres in Woodward County, Oklahoma. The application was later amended to 2,920 acre feet per year from 27 wells, subject to future amendment for the full 4,520 acre feet per year. The application was opposed by surrounding landowners, Messer–Bowers Co. Inc., Mark

Mayo, Billie Mayo, and Floyd Sears (Landowners) who own ranch land adjacent to the Kronseder property. They asserted that Kronseder's use of the requested groundwater would diminish and contaminate their supply of groundwater from wells and springs.

¶ 3 The Kronseder property consists of a large tract of 4,280 acres and a narrow strip of 240 acres which extends south from the large tract to within a mile of the north bank of the North Canadian River. Over half of the water produced will come from this 240 acre strip and will be carried by pipe to the swine facility. No swine operations will be located on that strip of land.

¶ 4 When completed, the facility would house 142,000 pigs. About one third of the groundwater would be used for livestock consumption. Most of the remaining two thirds will be used to wash pig manure from the facilities and into retention lagoons. The effluent and fresh groundwater will then be applied to 1,760 acres of native grass.

¶ 5 On July 16, 1996, staff of the Water Board conducted a hearing. The Water Board approved the application at its regular meeting on October 8, 1996. Appellants sought judicial review of the Water Board's order in the District Court of Woodward County. The District Court remanded the matter to the Water Board on an issue unrelated to today's review. The Water Board again approved the application on September 9, 1997. The District Court upheld the order on October 30, 1997. The Court of Civil Appeals affirmed that decision and this Court granted certiorari review. The decision of the Court of Civil Appeals is now vacated and the cause is remanded to the Water Board with directions.

### Groundwater or Stream Water

[1] ¶ 6 A preliminary issue in this dispute is whether the permit proceeding should have been conducted under the stream water use statutes, Okla. Stat. tit. 82, §§ 105.1—105.18 (1991 & Supp.1999). Title 82 defines "Groundwater" as "fresh water under the surface of the earth regardless of the geologic structure in which it is standing or moving outside the cut bank of any definite stream".

Okla. Stat. tit. 82, § 1020.1(1) (Supp.1995). A "definite stream" is a "watercourse in a definite, natural channel, with defined beds and banks, originating from a definite source or sources of supply." Okla. Stat. tit. 82, § 105.1 (Supp.1995). The significance of the classification is that "[t]he owner of the land owns water standing thereon, or flowing over or under its surface but not forming a definite stream." Okla. Stat. tit. 60, § 60 (Supp. 1988). Thus, groundwater and diffuse surface water are owned by the surface landowner subject to beneficial use. *See* Okla. Stat. tit. 82, § 1020.7 (Supp.1993) ("Any person intending to use groundwater shall make application to the Board for an appropriate permit....”). Stream water on the other hand, is "public water and is subject to appropriation for the benefit and welfare of the people of the state as provided by law." The landowner "may use [such] water for domestic uses." Okla. Stat. tit. 82, § 105.1A (Supp. 1993).

¶ 7 Landowners argue that when the Kronseder application was filed the Water Board should have determined whether there were natural springs in the area and whether granting the permit would affect water running under the surface or the natural springs themselves. They base their argument on the construction of title 60, section 60 found in *Oklahoma Water Resources Board v. City of Lawton,* 580 P.2d 510 (Okla.1978) There, a surface landowner wanted to encase a prolific spring and divert the water for recreation, housing development, and commercial development. The water which flowed from the spring ran into a nearby creek and ultimately into Lake Lawtonka, the major source of water for the City of Lawton. *Id.* at 511. The issue was whether the spring water should be classified as stream water or groundwater for purposes of an appropriation permit from the Water Board. On appeal, this Court held that "when natural spring water forms a definite stream, the water in the stream and the spring itself, from its inception, is to be classified as stream water and appropriated as such." *Id.* at 513. The opinion noted that this was true despite the fact that the source of all springs is groundwater. *Id.* at 511. The Water

Board in this matter determined that "the water applicant [Kronseder] intends to use is clearly groundwater." Landowners' expert opined that numerous wells on Kronseder's land would draw down the water table to the extent that the natural springs on neighboring land would go dry. Kronseder's expert testified that the watertable would not be lowered by Kronseder's use of water to the extent the springs would go dry. The Water Board's order stated that "the premise that the Applicant's use will cause a spring to go dry has not been established as a matter of fact." The Water Board also rejected Landowner's legal argument that by taking so much water that the springs go dry, Kronseder is in effect taking stream water and therefore must proceed under the stream water statutes. The Water Board specifically found the water to be "fresh water under the surface of the earth regardless of the geologic structure in which it is standing or moving outside the cut bank of any definite stream." Okla. Stat. tit. 86, § 1020.1 (Supp. 1995). Therefore, it proceeded under the groundwater statutes.

■ ¶ 8 The Water Board properly determined that the groundwater statutes apply. This Court's holding in *City of Lawton* was that when natural spring water forms a definite stream, the spring from its inception is to be classified as stream water and appropriated as such. The "point of inception" referred to the point at which the spring, and thus the stream began, not to the ultimate source of all spring water which is a groundwater formation. This understanding is consistent with the definition provided by Landowners' expert that a spring is the point at which the water table surfaces. Thus, when the groundwater surfaces as a spring and forms a stream, it is at that point that the stream water statutes apply.

¶ 9 Here, Kronseder was not making application to withdraw water from a spring or a stream. It sought a permit to drill several new wells and utilize existing wells to drain water directly from the groundwater basin. As the Water Board determined, the water to be withdrawn by the Kronseder wells is groundwater subject to regulation by the Oklahoma Groundwater Law. The remaining issues in this appeal involve the permit proceedings under the groundwater statutes.

The Permit Requirements

¶ 10 The policy underlying the groundwater statutes is "to utilize the groundwater resources of the state and for that purpose to provide reasonable regulations for the allocation for reasonable use based on hydrologic surveys of fresh groundwater basins or subbasins to determine a restriction on the production based upon the acres overlying the groundwater basin or subbasin." Okla. Stat. tit. 82, § 1020.2 (1991). The Water Board determines the maximum annual yield of groundwater to be produced from each groundwater basin based on a hydrologic survey. *Id.* at § 1020.5 (Supp.1993). The yield for the groundwater basin involved in this matter has been set at one acre foot [1] of water per acre of surface land overlying the basin. Any person intending to use groundwater must make application to the Water Board before taking it from a completed well or drilling a new well. *Id.* at § 1020.7. The Water Board must determine four issues in deciding whether to grant a groundwater permit:

(a) Whether the applicant owns or leases or has some other sufficient interest in the surface of the land dedicated to the application;

(b) Whether such land overlies a fresh groundwater basin or subbasin;

(c) Whether the use to which the applicant intends to put the water is a beneficial use; and

(d) That waste by depletion or waste by pollution will not occur.

Okla. Admin. Code § 785:30-3-5; Okla. Stat. tit. 82, § 1020.9(A) (Supp.1993). The first three of these issues were not contested. The third and fourth issues measure the reasonable use of fresh groundwater. If the Water Board finds for the applicant on all four issues, it must issue a permit. Okla. Stat. tit. 82, § 1020.9(A).

---

1. One acre foot of water contains 325, 830 gallons of water.

## Reasonable Use

¶ 11 Landowners challenge Kronseders' plan to withdraw most of its water from six wells on the narrow strip of land it purchased which extends south from the large tract on which its swine facilities will be located. The water will be piped from the producing property to the swine facilities on Kronseder's adjoining property. They argue that Kronseder's plan to withdraw over half of its groundwater from less than 3% of its property constitutes an unreasonable use of its groundwater.

¶ 12 This issue was addressed by the Water Board. It reduced the number of wells that can operate on the strip of land at any one time to three. Further, this Court held in *Oklahoma Water Resources Board v. Texas County Irrigation & Water Resources Association, Inc.,* 711 P.2d 38, 43 (Okla.1984), that the movement of fresh groundwater off the producing premises is not prohibited by the statutory limitation of reasonable use.

## Waste by Depletion

¶ 13 Landowners also assert that the Water Board erred in failing to find that Kronseder's operation would cause waste by depletion. The Water Board held that Landowners had failed to prove as a matter of fact that Kronseder's water use would deplete Landowner's groundwater. There was conflicting expert testimony from both sides on this issue. The Water Board found Kronseder's evidence to be more credible.

## Waste by Pollution

¶ 14 At the hearing on Kronseder's application for a groundwater permit Landowners attempted to argue that Kronseder's irrigation of its crops with effluent (manure mixed with fresh groundwater) would result in groundwater pollution. The Water Board limited its inquiry into waste by pollution to the construction and operation of Kronseder's wells and water distribution system. It held that jurisdiction to determine the potential for pollution as a result of the use and operation of lagoons and the land application system were outside its jurisdiction and within the purview of the State Department of Agriculture, specifically in this matter under the Oklahoma Feed Yards Act (now the Oklahoma Concentrated Animal Feeding Operations Act, Okla. Stat. tit. 2, §§ 9–200—9–214 (Supps.1997 & 1999)). The Water Board found that the construction and operation of Kronseder's wells and water distribution system would not likely result in waste by pollution. Thus, the issue is whether Water Board's waste by pollution inquiry was properly limited to pollution that results from the extraction and transportation of groundwater and not from the groundwater's ultimate use. The Oklahoma Attorney General was permitted to file an amicus brief in opposition to the Water Board's position on the issue of waste by pollution.

¶ 15 Central to the issue is this Court's decision in *Oklahoma Water Resources Board v. Texas County Irrigation and Water Resources Association, Inc.,* 711 P.2d 38 (Okla.1984) In *Texas County,* Mobil Oil Corporation sought to use fresh groundwater for tertiary recovering operations in an oil field. Although its tertiary process involved adding detergents and polymers to the groundwater, Mobil presented no evidence identifying the chemical additives or their effect on the groundwater. *Id.* at 45. This Court remanded the matter to the Water Board to receive evidence and make essential findings of fact to determine whether waste by pollution would occur. *Id.* at 47. On remand the Water Board was also directed to apply the following statutory definition of pollution:

> Wherever used in this title the following terms shall have the respective meanings hereinafter set forth or indicated, unless the context otherwise requires:
>
> 1. "Pollution" means contamination or other alteration of the physical, chemical or biological properties of any natural waters of the state, or such discharge of any liquid, gaseous or solid substance into any waters of the state as will or is likely to create a nuisance or render such waters harmful or detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life.

*Id.* at 44 (quoting Okla. Stat. tit. 82, § 926.1 (1981), now codified at section 1084.2 of title 82).[2]

¶ 16 Kronseder and the Water Board, however, view the holding in *Texas County* as superseded by the enactment of the Oklahoma Environmental Quality Act, Okla. Stat. tit. 27A, § 1–1–201—1–4–107 (Supp.1999), in 1992 & 1993. That Act was intended to (1) address "environmental concerns of industry and the public ... in an expedient manner," (2) improve the tracking and resolution of citizen complaints, (3) "better utilize state financial resources for environmental regulatory services", and (4) "coordinate environmental activities of state environmental agencies." *Id.* at § 1–1–102 (Supp.1993). To further these purposes, the Act created the Secretary of Environment as a cabinet position and created the Oklahoma Department of Environmental Quality. It also set out "jurisdictional areas of environmental responsibility" for each state environmental agency. *See id.* at § 1–3–101 (Supp.1992 & Supp.1999). The Oklahoma Department of Agriculture was given responsibility for "point source discharges[3] and nonpoint source runoff from agricultural crop production, agricultural services, livestock production, silviculture, feed yards, livestock markets and animal waste." *Id.* at § 1–3–101(D)(1)(a).

¶ 17 The Water Board interpreted this as a grant of exclusive jurisdiction covering the disposal of animal waste effluent on agricultural crops. It further concluded that the Act superseded the *Texas County* requirement that a groundwater permit applicant must present evidence concerning the effect of what it adds to fresh groundwater and whether the additives will filter back and contaminate the groundwater formation. *See* 711 P.2d at 45.

¶ 18 "The primary goal of statutory construction is to determine legislative intent. That intent is to be ascertained from the statute in light of its general purpose and object. It is presumed that the Legislature has expressed its intent in a statute and that it intended what is so expressed." *TXO Prod'n Corp. v. Oklahoma Corp. Comm'n,* 829 P.2d 964, 968—969 (Okla.1992) (footnotes omitted). Section 1–3–101 assigns jurisdictional areas of responsibility to the state's environmental agencies. Only the Corporation Commission is given "exclusive" environmental jurisdiction in the area of oil and gas. *See id.* at § 1–3–101(c). By its own terms "[t]he jurisdictional areas of environmental responsibility specified in this section *shall be in addition to those otherwise provided by law* and assigned to the specific state environmental agency." Nothing in the Act provides that the Department of Agriculture has *exclusive* jurisdiction which prevents the Water Board from granting a groundwater permit on a finding that the mixing of fresh groundwater with animal waste and its use of effluent for irrigation will not cause waste by pollution. The Act specifically made the Water Board's jurisdictional responsibility for pollution of groundwater in addition to that otherwise provided by law. This includes the directives contained in the *Texas County* opinion concerning waste by pollution. Further, the text of the Act evidences an intent that the Water Board and the Agriculture Department have concurrent environmental jurisdiction over livestock facilities which require water permits. The Court of Civil Appeals opinion which held that the Act superceded the *Texas County* opinion is vacated. On remand, the Water Resources Board is directed to receive evidence and make findings of fact to determine whether waste by pollution will occur through all uses of groundwater at Kronseders swine facilities,

---

**2.** Contrary to Kronseder's assertion that this definition was repealed, it was merely renumbered in 1993.

**3.** " 'Point source' means any discernible, confined and discrete conveyance or outlet including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure container, rolling stock or vessel on other floating craft from which pollutants are or may be discharged into waters of the state." The term "shall not include

agricultural storm water runoff and return flows from irrigated agriculture." Okla. Stat. tit. 27A § 1–1–201(9) (Supp.1999). " 'Nonpoint source' means the contamination of the environment with a pollutant for which the specific point of origin may not be well defined and includes but is not limited to agricultural storm water runoff and return flows from irrigated agriculture." *Id.* at § 1–1–201(6).

including the spread of effluent from its swine operation onto its land. Kronseder must present evidence concerning the effect of its effluent irrigation on the groundwater formation.

CERTIORARI PREVIOUSLY GRANTED; OPINION OF COURT OF CIVIL APPEALS VACATED; TRIAL COURT REVERSED IN PART; DECISION OF WATER RESOURCES BOARD REVERSED IN PART; CAUSE REMANDED TO WATER RESOURCES BOARD WITH DIRECTIONS.

¶19 HODGES, LAVENDER, KAUGER, WATT, WINCHESTER, JJ., concur.

¶20 HARGRAVE, V.C.J., OPALA, J., concur in part; dissent in part.

¶21 SUMMERS, C.J., BOUDREAU, J., disqualified.