The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: August 14, 2025

**No. A-1-CA-41226**

**CONCERNED CITIZENS FOR NUCLEAR SAFETY and HONOR OUR PUEBLO EXISTENCE,**

Petitioners-Appellants,

v.

**NEW MEXICO WATER QUALITY CONTROL COMMISSION,**

Respondent-Appellee

and

**TRIAD NATIONAL SECURITY, LLC and NEW MEXICO ENVIRONMENT DEPARTMENT,**

Intervenors-Appellees,

**IN THE MATTER OF THE PETITION FOR REVIEW OF THE DECISION OF THE NEW MEXICO ENVIRONMENT DEPARTMENT ISSUING GROUND WATER DISCHARGE PERMIT NO. DP-1132.**

**APPEAL FROM THE NEW MEXICO WATER QUALITY CONTROL COMMISSION**

Lindsay A. Lovejoy, Jr.
Santa Fe, NM

for Appellants

Raúl Torrez, Attorney General
Santa Fe, NM
Emily Bowen, Assistant Attorney General
Alexander W. Tucker, Assistant Solicitor General
Albuquerque, NM

for Appellee New Mexico Water Quality Control Commission

Gloria I. Lucero, Deputy General Counsel
Albuquerque, NM

for Appellee N.M. Environment Department

Montgomery & Andrews, P.A.
Jeffrey J. Wechsler
Kari E. Olson
Santa Fe, NM

Los Alamos National Laboratory
Maxine M. McReynolds
Christopher C. Stoneback
Los Alamos, NM

for Intervenors-Appellees Triad National Security, LLC

**OPINION**

**BUSTAMANTE, Judge, sitting by designation.**

{1}    The opinion filed on May 19, 2025, is hereby withdrawn, and this opinion is substituted in its place, following Respondent New Mexico Water Quality Control Commission's timely motion for rehearing, which this Court denies.

{2}    This case arises from a decades-long effort by the Los Alamos National Laboratory (the Laboratory), its various managing entities—Triad National Security, LLC (Triad), the current managing entity for the Laboratory—and the United States Department of Energy (DOE) (collectively, the Permitees) to receive a ground water discharge permit from the New Mexico Environmental Department (NMED) for the Laboratory's radioactive liquid waste treatment facility (RLWTF). NMED issued Permit No. DP-1132 (the Permit) on May 5, 2022. In accordance with NMSA 1978, Section 74-6-5(O) (2009), Appellants Concerned Citizens for Nuclear Safety and Honor Our Pueblo Existence (collectively, Citizens) timely filed a petition for review with Appellee, the Water Quality Control Commission (WQCC). The petition for review was granted on August 30, 2022. The WQCC subsequently dismissed Citizens' petition for "lack of standing" after it decided that Citizens were not "adversely affected" by issuance of the Permit as required by Section 74-6-5(O). Citizens appeal from the WQCC order dismissing their petition for review. We conclude that the WQCC erroneously imposed an unduly narrow interpretation of

the statutory concept of "adversely affected." We reverse and remand the matter to the WQCC, ordering it to consider and resolve Citizens' petition on its merits.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     History of the Permit's Permitting Process**

{3}     The administrative record in this matter exceeds 20,000 pages. The majority of the record is not relevant to the narrow statutory interpretation issue we address in this opinion, and there is no need to canvas the entire record. It is useful, however, to summarize certain portions of the record to provide historical and procedural context for our discussion.

{4}     Construction of the RLWTF started in 1961 and processing of liquid waste began in 1963. The record does not reveal any other activity until April 1996, when NMED notified the Laboratory that a discharge permit was required. The first application for a permit was filed in August 1996. The application has been periodically amended since then as the design and function of the RLWTF evolved. Drafts of the permits were periodically issued for public comment from 2003 to 2017. Though NMED determined as early as 2000 that a public hearing would be required, no hearing was held until April 2018. Following the 2018 public hearing, the hearing officer recommended issuance of the Permit. NMED agreed and filed its final order approving and issuing the Permit in August 2018. In June 2019, however, the WQCC "ruled that the former [h]earing [o]fficer's job application and

subsequent hiring by one of the parties created an improper appearance of bias potentially affecting the Secretary [of NMED's (the Secretary)] deliberation and issuance of [the Permit]." The WQCC accordingly vacated the Secretary's order and remanded the matter to the NMED "for a new hearing with a newly appointed [h]earing [o]fficer."

{5}     A second public hearing before the new hearing officer was held in November 2019. After receiving written closing arguments and proposed findings of fact and conclusions of law from Citizens, NMED, Triad, and DOE, the hearing officer filed his report recommending that the Permit be issued in the form proposed by NMED and Triad. The Secretary's June 24, 2020 order, filed in response to the hearing officer's report concluded that "[m]atters related to the appropriate regulatory treatment of the RLWTF, . . . including the practicality of enforcement of the applicable [Hazardous Waste Act (HWA), NMSA 1978, §§ 74-4-1 to -14 (1977, as amended through 2021),] permit conditions, are properly raised before the [Hazardous Waste Board] and not in this proceeding." Interestingly, the Secretary's 2020 order did not constitute final approval of the hearing officer's report or result in issuance of a permit. Instead, it remanded the matter to the Ground Water Quality Bureau for further consideration of financial assurances regarding closure and post-closure care of the facilities at RLWTF. The record is not clear how or when the

remand issue was resolved. In any event, the permit was finally issued on May 5, 2022.

{6}     Citizens are organizations composed of persons living downstream and in close proximity to the point of discharge—or outfall—of wastewater from the RLWTF. NMED and Triad recognize that Citizens have actively participated in the public review of the Permit's permitting process since at least 2013. NMED and Triad also recognize that Citizens have consistently argued that the HWA should be applied to the RLWTF rather than the Water Quality Act (WQA), NMSA 1978, §§ 74-6-1 to -17 (1967, as amended through 2019).

{7}     Among other pleadings, Citizens filed three formal motions asserting that it was unlawful for NMED to issue a discharge permit for the RLWTF under the authority of the WQA. The first motion—filed March 16, 2018—sought dismissal of the "DP-1132 Proceeding" entirely. The first hearing officer denied the motion one month later in a five-line order that provided no analysis of the issues briefed by the parties. The second motion to dismiss the "DP Proceeding" was filed October 8, 2019. The second hearing officer denied the second motion solely on the basis that the matter was to be heard anew after the first hearing officer's report was vacated. After the permit was issued and after the WQCC had granted their request for permit review, Citizens filed a third motion requesting that the WQCC "revers[ing] the issuance of [the Permit] for lack of subject matter jurisdiction." The WQCC order

denying the motion did not discuss the legal issue raised by Citizens. The WQCC order instead referred to an order entered seventeen days before, staying proceedings in the WQCC pending resolution of a purportedly related adjudication then in the United States Environmental Protection Agency's Environmental Appeals Board (the EAB).

{8} In addition to the motions, Citizens argued to the hearing officer in their proposed findings of fact, conclusions of law and final argument that NMED could issue the Permit only if it proved that the RLWTF was exempt from the HWA under the provisions of Section 74-6-12(B). In his revised report, the hearing officer responded to Citizens' arguments on their merits, concluding essentially that Section 74-6-12(B) did not provide for a stark HWA *or* WQA split of jurisdiction, in particular given that the Permit's permitting process did "not propose to regulate an '. . . activity or condition subject to the authority of the environmental board.'" Rather, the hearing officer stated that the Permit "is proposed to abate water pollution." Yet, the hearing officer also noted that Citizens' pending motion raised significant issues concerning the regulation of the RLWTF under the HWA, but concluded that the issues were more properly dealt with in other forums. The hearing officer was careful to note that the decision in the Permit's proceeding was "based upon and limited to the WQA and is not intended to address the application of the HWA to other activities at the RLWTF."

{9}     In sum, Citizens were actively involved in the public hearing process for at least ten years prior to the issuance of the Permit. Citizens consistently argued that it was unlawful for NMED to issue a discharge permit for the RLWTF under the WQA because the HWA applied instead. The WQCC has steadfastly refused to address Citizens' arguments on their merits.

## II.     The Dismissal for Lack of Standing

{10}     The August 2022 order staying proceedings in the WQCC was lifted in February 2023 in response to a motion filed by Triad and the DOE alerting the parties that the EAB had remanded its matter to the EPA regional office to receive more comments from the public and revise its field work before reissuing the Permit. Triad and NMED—who had not responded to Citizens' petition for review because of the stay—filed their answer briefs in March 2023.

{11}     The issue of Citizens' standing to continue participating in the permit review process was first broached by Triad and the DOE in their answer brief. Keying off of Triad's suggestion, on March 20, 2023, the hearing officer requested another round of simultaneous briefing specifically addressing standing. All parties filed their briefs eleven days later. Six days after that, the hearing officer filed his report on the issue, recommending that the WQCC "dismiss the [v]erified [p]etition with prejudice on the grounds that [Citizens] lack standing and the [WQCC] lacks subject matter jurisdiction to preside over this [p]etition." The hearing officer acknowledged

Citizens' arguments that "permitting should be conducted under the NM Hazardous Waste Act (HWA) and not the WQA" and that the failure to apply the more stringent standards of the HWA "creates and enhanced risk of exposure to hazardous and radioactive waste to members of HOPE and others in New Mexico." The hearing officer dismissed all of Citizens' arguments concerning the application of the HWA as irrelevant to the consideration of the Permit because it had been issued under the authority of the WQA. In essence, the hearing officer concluded that HWA-related concerns could not be considered to have adversely affected Citizens within the meaning of Section 74-6-5(O). The hearing officer did not cite to Section 74-6-12(B) or acknowledge Citizens' argument that a permit could not be issued under the WQA unless the RLWTF was exempt from the HWA.

{12} Accepting the hearing officer's recommendation, the WQCC dismissed Citizens' petition for review with prejudice. The WQCC noted that, in its view, Citizens "did not allege, much less establish, that they were adversely affected by NMED's DP-1132 . . . permitting action." The WQCC summarized Citizens' argument as follows: "Rather than allege any adverse effect arising from NMED's . . . permitting action under the [WQA], [Citizens] claimed that some sort of hazardous waste permitting (action) should have been conducted before NMED under the [HWA] . . . and that the failure to conduct a permitting action under the [WQA] . . . was what adversely affected them." The WQCC concluded that

administrative hearings under the HWA "are not matters within the jurisdiction of the Commission, and claims alleging the same do not serve to confer standing before the Commission." The WQCC then rephrased the conclusion, stating that "[w]hether a permitting action should have been conducted under the [HWA] is not relevant to the question of whether under Section 74-6-5(O)[, Citizens] were adversely affected by NMED's permitting action in issuing [the Permit]." Like the hearing officer, the WQCC did not mention Section 74-6-12(B).

**DISCUSSION**

{13}     Our standard of review in appeals from actions of the WQCC is stated in Section 74-6-7(B), which provides: "Upon appeal, the [C]ourt of [A]ppeals shall set aside the commission's action only if it is found to be: (1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law."

{14}     The WQCC dismissed Citizens' petition for review on the ground that Citizens lacked standing under Section 74-6-5(O) because they did not establish that they had been adversely affected by the issuance of the Permit. *See id.* ("A person who participated in a permitting action before a constituent agency or a person affected by a certification of a federal permit and who is adversely affected by such permitting action or certification may file a petition for review before the commission."). Generally, whether a party has standing is a question of law which

8

appellate courts review de novo. *Forest Guardians v. Powell*, 2001-NMCA-028, ¶ 5, 130 N.M. 368, 24 P.3d 803; *Prot. & Advocacy Sys. v. City of Albuquerque*, 2008-NMCA-149, ¶ 17, 145 N.M 156, 195 P.3d 1. For purposes of considering the issue of standing, courts accept as true all allegations of the complaint, and must construe the complaint in favor of the complaining party. *Powell*, 2001-NMCA-028, ¶ 5.

{15}    As noted above, the WQCC concluded that challenging the jurisdiction of NMED and the WQCC to issue a permit for the RLWTF under the WQA did not fall within the concept of "adversely affected" under Section 74-6-5(O). The WQCC and the Permittees did not—and, indeed, could not—dispute that Citizens actively participated in the WQA process throughout the public hearing phases of it. In addition, neither the WQCC or the Permittees have ever argued that Citizens did not have sufficient environmental, aesthetic, health, recreational, and regulatory concerns to allow them to participate in the permitting process. It is clear from the affidavits appended to Citizens' briefing to the WQCC on the standing issue that they meet the liberal standards set by the United States Supreme Court and New Mexico's courts to establish standing in matters involving environmental activities. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000); *Benham v. Ozark Materials River Rock, LLC*, 885 F.3d 1267, 1273 (10th Cir. 2018); *Ramirez v. City of Santa Fe*,1993-NMCA-049, ¶¶ 8-16, 115 N.M. 417, 852 P.2d 690. As such, we view the WQCC's order as a purely legal decision

involving the interpretation of the meaning of "adversely affected" in Section 74-6-5(O). The WQCC's approach to deciding the standing issue did not rely on any factual deficit in Citizens' status as entities with a real interest in the permitting process. Rather, the WQCC resolved the issue by construing Section 74-6-5(O) as a matter of law to not include challenges to its and NMED's power to issue a permit under the WQA. Thus, the case presents to us as a question of statutory interpretation.

{16}    Interpretation of statutes is a question of law, which appellate courts review de novo. *Wood v. N.M. Educ. Ret. Bd.*, 2011-NMCA-020, ¶ 12, 149 N.M. 455, 250 P.3d 881. As a general matter, we are not bound by the WQCC's interpretation of Section 74-6-5(O). *See Summers v. N.M. Water Quality Control Comm'n*, 2011-NMCA-097, ¶ 10, 150 N.M. 694, 265 P.3d 745. We accord some deference to agency interpretations of statutory provisions if the issue presented implicates special agency expertise or the determination of policy within the scope of the agency's function. *N.M. Indus. Energy Consumers v. N.M. Pub. Regul. Comm'n*, 2007-NMSC-053, ¶ 19, 142 N.M. 533, 168 P.3d 105; *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 10, 120 N.M. 579, 904 P.2d 28. Analysis of standing issues is not a matter within the WQCC's special expertise and, thus, no deference to its ruling is required.

{17} As noted above, throughout its participation in the Permit's review process Citizens challenged the applicability of the WQA to the RLWTF. Citizens have consistently argued that the HWA is the statutory/regulatory scheme that applies—to the exclusion of the WQA.[1] Citizens base their jurisdictional argument on Section 74-6-12(B), which provides:

> The [WQA] does not apply to any activity or condition subject to the authority of the environmental improvement board pursuant to the [HWA], the Ground Water Protection Act, [NMSA 1978, §§ 74-6B-1 to -14 (1990, as amended through 2018)] or the Solid Waste Act[, NMSA 1978, §§ 74-9-1 to -43 (1990, as amended through 2011)] except to abate water pollution or to control the disposal or use of septage and sludge.

In their petition for review, Citizens again asserted that "[i]t is undisputed the RLTWF stores and treats hazardous waste. [The Laboratory] concedes that the RLTWF will 'receive and treat or store an influent wastewater which is hazardous waste as defined in 40 C.F.R. § 261.3 (2024).'" From this, Citizens again asserted that the HWA applies and that the WQA does not apply. In response, Appellees maintain that the HWA does not apply because the RLTWF is exempt from federal permitting, the application of which is the very purpose of the HWA. Yet under the WQCC's approach, this predicate question remains unresolved despite it affecting

---

[1]Citizens also raised other, more technical issues with the applicability of the HWA. We do not discuss them because the statutory standing issue is sufficient to resolve the narrow question before us.

11

the very jurisdiction upon which the WQCC is able to evaluate the propriety of the requested permit in the first instance.

{18}    Citizens correctly noted in their petition for review that, despite the seriousness of its jurisdictional arguments, the hearing officer and the Secretary had steadfastly refused to confront and resolve the issue. The hearing officer and the WQCC again failed—or perhaps refused—to recognize the jurisdictional issue in their analysis of the standing question. The hearing officer's report did not acknowledge that Citizens' petition challenged the subject matter jurisdiction of the WQCC and the applicability of the WQA to the RLWTF. Similarly, the WQCC order failed to resolve or substantively consider Citizens' challenge to the WQCC's subject matter jurisdiction to consider and approve NMED's permitting process. Instead, the WQCC decided that because Citizens had not challenged any substantive provision of the Permit, they necessarily failed to prove that they were adversely affected by the permitting action. We conclude that the WQCC misinterpreted and misapplied Section 74-6-5(O).

{19}    The phrase "adversely affected" as used in the WQA has been examined only once by the courts. *See N.M. Cattle Growers' Ass'n v. N.M. Water Quality Control Comm'n*, 2013-NMCA-046, ¶ 7, 299 P.3d 436. In *New Mexico Cattle Growers' Ass'n*, this Court concluded that the Cattle Growers' Association was not adversely affected by the WQCC's regulatory decision to designate certain surface waters in

New Mexico as Outstanding National Resource Waters. The designation arguably had some potential to remove livestock from the affected areas and reduce grazing allotments. *Id.* ¶¶ 12, 13. The Association argued that the potential future effects of the designation on the overall health of the cattle industry were enough to give it standing to appeal. This Court disagreed. We noted that grazing permittees were specifically exempted from the Outstanding National Resource Water requirements. As such, the "evidence at the hearing showed that there would be no negative economic impact of grazing allotments affected by [the] designation." *Id.* ¶ 6. Further, we noted that the Association had presented no evidence to contradict the WQCC's finding of no negative economic impact on its members or on the industry as a whole. *Id.* ¶¶ 12, 13. Based on these two aspects of the record, we concluded that the Association had not demonstrated any cognizable injury to its members.

{20} *New Mexico Cattle Growers' Ass'n* thus involved a normal, fact-based scenario involving no real-world injury to the Association or its members from the WQCC's regulatory action. *New Mexico Growers' Ass'n* did not delve deeply into the concept of "adversely affected" because it did not need to do so. The opinion should not be read to establish a rule that only economic or other tangible real-world effects can qualify as "adversely affected" under the WQA.

{21} Citizens' argument is of a different order. Citizens' challenge strikes at the heart of the regulatory process followed by NMED and the WQCC by questioning

13

whether the WQA applies to the RLTWF at all. If it does not, NMED and the WQCC do not have subject matter jurisdiction to conduct the permitting process that resulted in the issuance of the Permit. The question is whether persons otherwise having standing under the normal fact-based criteria can pursue their jurisdiction argument in a Section 74-6-5(O) proceeding without asserting specific errors or shortcomings in the permitting process. We conclude they can.

{22} It is a commonplace that as creatures of statutory creation, administrative agencies are limited to exercising only that power and authority expressly granted to them by statute or necessarily implied by statute. *Martinez v. State Eng'r Off.*, 2000-NMCA-074, ¶ 22, 129 N.M. 413, 9 P.3d 657. In addition, an administrative agency has the "authority at all times to examine facts and make a finding concerning its own jurisdiction, subject, of course, to review by the courts." *Cibas v. N.M. Energy, Mins. & Nat'l Res. Dep't.*, 1995-NMCA-046, ¶ 17, 120 N.M. 127, 898 P.2d 1265 (citing *State ex rel. State Corp. Comm'n v. Zinn*, 1963-NMSC-048, 72 N.M.29, 380 P.2d 182). Given these two aspects of the administrative legal landscape, we conclude that, when an entity or person appropriately participating in a WQA administrative process challenges an agency's subject matter jurisdiction, the agency must address and resolve the challenge on its merits. Put another way, the agency has a threshold duty to determine if it has the power to act in the manner in which it has been tasked—in this case, with approval or rejection of the permit at issue. It

14

cannot—as happened here—delay, deflect, or defer resolution of a threshold determination on grounds that relate to some possible defect in the person or entity calling into question the authority of the administrative body.

{23} When evaluating qualifications to bringing suit or participating in administrative processes, we must consider what the Legislature intended as expressed in the words it chose. *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶¶ 13,14, 121 N.M. 764, 918 P.2d 350. Inclusion of a requirement that petitioners appealing from a permitting action must have participated in the process and be adversely affected by it indicates that the Legislature wished to ensure that petitioners had a demonstrated interest in the permit. In a word, the Legislature imported the concept of standing to limit access to the petition for review mechanism and prevent strangers to particular permit processes to intervene at the figurative last minute. The words "adversely affected" by themselves, however, carry no hint that the only legally relevant "adverse" effect under Section 75-6-5(O) must be found in some facet of or mistake in the Permit itself. It is hard to conceive of a more important structural "adverse" effect than to allow an administrative agency to exercise a power it has not been granted in its foundational statutes. That adverse effect—potentially allowing an agency to do what it is not empowered to do—is sufficient to allow Citizens as participants in the permitting process to ask the WQCC to consider the purely legal—but fundamental—question about the power

15

of NMED to issue the Permit and the WQCC to approve it. Allowing Citizens to pursue the issue does not conflict with or threaten the Legislature's desire to limit access to the petition for review process given that Citizens have unquestioned fact-based standing to pursue an internal appeal on other "substantive" grounds. It would be unreasonable to hold otherwise. *See Britton v. Off. of the Att'y Gen.*, 2019-NMCA-002, ¶ 27, 433 P.3d 320.

{24}    Our decision is bolstered by considerations of judicial and administrative efficiency. Accepting the WQCC's position would require Citizens to pursue remedies in the courts pursuant to the Declaratory Judgment Act, NMSA 1978, §§ 44-6-1 to -15 (1975), or by extraordinary writ. Our case law has addressed the difficulties inherent in such scenarios in a limited number of cases. For example, in *Zinn*, 1963-NMSC-048, ¶¶ 14-24, our Supreme Court entered a permanent writ of prohibition preventing the district court from entertaining a declaratory action challenging the previously named State Corporation Commission from deciding in the first instance whether it had the power to decide whether the plaintiff was engaged in the transportation for hire—and was thus subject to the State Corporation Commission's licensing power. In *Smith v. City of Santa Fe*, 2007-NMSC-055, ¶¶ 25-27, 142 N.M. 786, 171 P.3d 300, our Supreme Court approved use of a declaratory action to challenge the City of Santa Fe's power to deny a well drilling permit only because a city administrative proceeding had never been commenced. If

the city had started an administrative process, the plaintiff would have been limited to that process and would have been required to exhaust their administrative remedies.

{25}    The latest pronouncement from our Supreme Court is *Citizens for Fair Rates and the Environmental v. New Mexico Public Regulation Commission*, 2022-NMSC-010, 503 P.3d 1138. There the Court agreed to hear and resolve a constitutional challenge to the Energy Transition Act, NMSA 1978, §§ 62-18-1 to -23 (1998, as amended through 2023), even though the New Mexico Public Regulation Commission (the Commission) had appropriately refused to reach the constitutional issues. *Citizens for Fair Rates & the Env't*, 2022-NMSC-010, ¶¶ 17-25. The Court reasoned that it would be better to decide the preserved and argued issue rather than require the protesting party to file a declaratory judgment action. *Id.* ¶ 22. As the Court noted, requiring a collateral attack on the Commission's order would "invite chaos and preclude certainty." *Id.* ¶ 24 (internal quotation marks and citation omitted). The same considerations obtain here. It would be contrary to all notions of judicial economy to require the question of NMED's power to issue and of the WQCC's power to approve the Permit to be litigated outside of the lengthy administrative process already in place. It would be particularly unwise to do so

based on the WQCC's artificially narrow construct of what "adversely affected" means for purposes of review and appeal of NMED's and the WQCC's work.[2]

**CONCLUSION**

{26}     We reverse and remand the matter to the WQCC. On remand, the WQCC shall consider and resolve Citizens' Section 74-6-12(B) jurisdiction arguments on their merits. Among the matters to be resolved on remand must be the merits of the arguments raised below by Citizens related to the applicability of the HWA to the Laboratory's RLWTF and the effect of Section 74-6-12(B). To that end, WQCC may, if need be, further remand this matter to the NMED to resolve issues, if any, that the NMED has exclusive statutory authority to resolve.

{27}     **IT IS SO ORDERED.**

 

 

                        _____
                        **MICHAEL D. BUSTAMANTE, Judge,**
                        **Retired, sitting by designation.**

---

[2]Citizens also appealed from the WQCC's refusal to vacate certain orders signed by the WQCC chair Stephanie Stringer while she was actively seeking employment with the DOE—one of the parties seeking the permit. Our reversal and the passage of time has mooted the main force of that portion of the appeal. We do not need to analyze the effects of Ms. Stringer's actions in any detail for that reason, and because counsel for NMED admitted at oral argument that her actions created a "considerable due process issue" in general. On remand, we encourage the WQCC to proceed with care and caution to ensure that all decision-makers are unbiased.

18

**WE CONCUR:**

_____

**J. MILES HANISEE, Judge**

_____

**ZACHARY A. IVES, Judge**